# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BRIAN BEGLEY, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>WINDSOR SURRY COMPANY, d/b/a WINDSORONE; AND WINDSOR WILLITS COMPANY, d/b/a WINDSOR MILL<br><br>        Defendants. | Civil Action<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

## INTRODUCTION

1.    Plaintiff Brian Begley brings this class action on behalf of himself and all others similarly situated against, by and through the undersigned attorneys, Defendants Windsor Surry Company, d/b/a WindsorONE ("Windsor Surry"), and Windsor Willits Company, d/b/a Windsor Mill ("Windsor Mill") (collectively "Defendants"), the manufacturer of the WindsorONE and WindsorONE+ Protected trim board products. Plaintiff alleges, upon personal knowledge as to himself and his own acts and experiences, and upon information and belief following the investigation of counsel as to all other matters, as follows.

2.    Defendants marketed and sold trim board with a 10-year warranty under the brand name of WindsorONE, which they advertised as being defect free, suitable or indicated for exterior use, and more durable and superior in performance than competing products. However, in reality, the WindsorONE trim board prematurely deteriorates, rots, and decays, resulting in significant damage to property owners, including Plaintiff. Specifically, WindsorONE trim board suffers from three common defects, each of which independently

lead to wood rot: (1) a failure to use a rot resistant wood, (2) a failure to use a preservative to deter wood rot, and (3) a failure to use a waterproof adhesive.

3.      Defendants sold WindsorONE trim board at a premium price over other trim board materials because of their claim that WindsorONE trim board had superior durability and performance in exterior applications.

4.      Defendants have sold, directly or indirectly, millions of linear feet of WindsorONE trim board to property owners, builders, contractors, carpenters, subcontractors, and other building professionals, directly and through retailers, distributors, wholesalers, lumber yards, building supply stores, and other distributors, for installation in homes, commercial buildings, and other structures across the country, including New Hampshire.

5.      Purchasers of WindsorONE trim board made their purchasing decisions based in part and in reliance upon the representations, statements, and information presented by Defendants' website, marketing literature, advertisements, and warranties. In addition, the purchasing decisions were also made based in part, and in reliance upon, the representations made by Defendants' authorized distributors, dealers, retailers, building supply stores, and lumber yards, all of whom sell WindsorONE trim board products.

6.      Defendants have knowingly and intentionally concealed, and failed to disclose, that–notwithstanding the statements and representations on their website, and in their brochures, advertisements, and warranties–their WindsorONE trim board product routinely rots and decays far in advance of the expiration of the warranty and before Plaintiff, class members, and the construction professionals would reasonably expect it to when exposed to routine and expected outdoor conditions. Indeed, WindsorONE trim board has rotted and decayed and will continue to do so at a rate that clearly demonstrates that the product is not durable, resilient, or fit for its intended use as an exterior trim board, trim, or molding.

7.      Similarly, Defendants have knowingly and intentionally concealed, and failed to disclose, that they actually had no intention of providing the services set forth in their warranties.

8.     Defendants have known for decades that their untreated WindsorONE trim board is prone to rot and decay, and routinely does, when installed to the exterior of a home, building, or other structure. In fact, Defendants have had notice of the deficiencies described herein and have been routinely notified by homeowners, contractors, builders, lumber yards, building supply stores, other trim board manufacturers, and others, that (1) the WindsorONE trim board, trim, and moldings installed outside rot and decay; (2) untreated Radiata Pine should not be used as wood for exterior trim board, trim, or moldings, because it rots; (3) WindsorONE trim board, trim, or moldings, made from untreated Radiata Pine, are not indicated for exterior use or application because the wood rot and decays; and (4) WindsorONE trim board, trim, or moldings, made from untreated Radiata Pine, should not be sold for exterior use or application because the wood rots and decays.

9.     Ignoring the complaints and concerns from customers, homeowners, builders, contractors, lumber yards, building supply stores, and others, Defendants failed to implement any changes or improvements to their WindsorONE trim board products or warranty procedures to remedy the defects associated with such products. Rather, Defendants continued to use untreated Radiata Pine in the manufacture of their WindsorONE trim board products.

10.     The following represents a small sampling of internet postings by contractors, builders, and installers, voicing their general frustrations with the defective WindsorONE trim board, Defendants' failure to accept responsibility, and Defendants' tendency to blame the failure of the product on installation and construction practices:

**Jackby (Jack's Construction, NH) (5/6/09):**

**Windsor One Rot Problem**

"I just used Windsor One pine trim on a recently built home and it is showing numerous areas of severe rot, has any body (sic) else experianced (sic) this?"

**Kent Whitten (5/7/09):**

**Re: Windsor One Rot Problem**

"If it's exterior, then it's no good. Pine is not a good choice for exterior. A year, maybe two I'm guessing and it's got blue rot. Once water gets in there, it's over."

**Jackby (5/7/09):**

**Re: Windsor One Rot Problem**

"House is in Massachusetts built about 1 ½ years ago, we used all correct building practices primed end cuts etc....but this stuff is really rotting like wev'e (sic) never seen on window casings, water tables, corner boards, now I have been speaking with other builders and hearing more problems....any body else?"

**Shyhook (5/7/09):**

**Re: Windsor One Rot Problem**

"...I would suspect the new paint formulas because that water born crap offers little if no protection against the elements."

**Aframe (5/8/09):**

**Re: Windsor One Rot Problem**

"I looked (sic) a trim replacement job last week on a 6-7 year old addition. FJ corner boards, casing, rakes, don't know if it's W1 yet...."

**Jason Whipple (5/8/09):**

**Re: Windsor One Rot Problem**

"Even though the site says it can be installed outside, one of the reps agreed with Gary at the Katz roadshow that it shouldn't be used outside."

**Dubz (5/8/09):**

**Re: Windsor One Rot Problem**

"I've seen several places where it rotted out after 2-3 or 5-6 years. My own four year old, factory installed, fjp window casings are rotting.

"I think it's due to the fact that today's engineered pine grows so fast. It has huge amounts of the softer, summer growth between the harder winter growth. Look at the growth rings on a piece of trim taken off a 50 year house compared to a cross section of windsor one.

"I'll never put it on one of my clients places. It's amazing how many contractors still do."

**A W Smith (5/8/09):**

**Re: Windsor One Rot Problem**

"exactly dubz. If they grew this crap any faster you may as well call it spongewood squareboards. I think the tree farm/ lumber industry needs to step back and take a second look at the hybrid crap they are passing off as lumber. Maybe a class action will shake them up."

**Jackby (5/14/09):**

**Re: Windsor One Rot Problem**

"Yes, I think your (sic) exactly right about the fast growth wood. Ive (sic) used a lot of pine products and have seen rot over a few years etc…but I have never seen wood rot at such an accelerated rate as this Windsor crap. The sad thing is the local yards thought they were selling the best thing since sliced bread…therefore guys like me had a very high expectations for this lumber and it turns out to be ten times worse than any thing we have seen before….I like the class action suit idea."

**Jason Whipple (5/18/09):**

**Re: Windsor One Rot Problem**

"Craig (President/CEO of Windsor Mill who responded to blog complaints),

"Please tell me what species of wood you use for your Millwork, and where it comes from. I'll be glad to fill you in on why it shouldn't be used outside from there."

**Kent Whitten (5/21/09):**

**Re: Windsor One Rot Problem**

"I cannot sit idly by anymore.

"Pine is absolutely the worst decision anyone can make for use as an exterior trim material. I don't care if it's WindsorOne and has the stamp of approval from 100 scientists. You will regret using it as a product.

"Once water gets in…..and it will get in…..it turns to pulp.

"You might as well rip strips of Advantech."

http://www.contractortalk.com/f11/windsor-one-rot-problem-58316/.

11.    The comments and frustration regarding the defective WindsorONE trim board did not go unnoticed by Defendants. Defendants' President and CEO, Craig Flynn, took up the gauntlet and defended his family's product. He responded as follows:

> **Craig Flynn (5/14/09):**
>
> **Re: Windsor One Rot Problem**
>
> **Response to Framerman: "**Based on the performance of many wood products today, I can understand your frustration. However, WindsorONE is in fact manufactured specifically for use on the exterior of the home, of which the substrate has been pine for the last 15+ years. Our proven DuraPrime 3-coat primer system and proprietary exterior glue-system are two key components in the success of WindsorONE's exterior performance. And following 1-3 above, with all job-site cuts re-coated, will greatly increase the performance of ALL wood trim products, not just WindsorONE."
>
> **Response to Skyhook: "**We agree that many 'water-borne' products provide little protection against the elements. However, our primer has been developed by our partner and is an exclusive paint to WindsorONE which is not a paint one can buy retail. I would appreciate the opportunity to send you tests demonstrating its effectiveness, specifically as it relates to oil-based products. You'll quickly see that our primer system performs superior to oil-based products over our pine substrate."

http://www.contractortalk.com/f11/windsor-one-rot-problem-58316/.

12.    After Craig Flynn came to the defense of the product and blamed the rotting on installation, contractors, builders, and carpenters, manufacturers of Eastern Pine trim board voiced their frustrations about the rotting WindsorONE trim board and Defendants' representations that its trim board, which is manufactured out of untreated Radiata Pine, can be used for exterior applications. This is just a sampling of the postings:

> **Jason Whipple to Craig Flynn (5/18/09):**
>
> **Re: Windsor One Rot Problem**
>
> "Craig,

"Please tell me what species of wood you use for your Millwork, and where it comes from. I'll be glad to fill you in on why it shouldn't be used outside from there."

**Craig Flynn Responding to Jason Whipple (5/19/09):**

**Re: Windsor One Rot Problem**

"Jason: Thank you for your offer, however we work with wood scientists from US Forest Products Laboratory, Forintek, private organizations and a number of Universities around the world regarding the suitability of wood species for millwork."

**Jason Whipple to Craig Flynn (5/20/09):**

**Re: Windsor One Rot Problem**

"WOW, all that science and no one told you that pine is near the bottom of the list for exterior trim? ("Eek" emoji)"

**Kent Whitten (5/21/09):**

**Re: Windsor One Rot Problem**

"I cannot sit idly by anymore.

"Pine is absolutely the worst decision anyone can make for use as an exterior trim material. I don't care if it's WindsorOne and has the same stamp of approval of 100 scientists. You will regret using it as a product.

"Once water gets in….and it will get in… it turns to pulp.

"You might as well rip strips of Advantech."

**Jason Whipple (5/22/09):**

**Re: Windsor One Rot Problem**

"Frankly, I'd like to here (sic) what type of wood is used for exterior trim by Windsor. Is it different from the interior trim? It should be."

**Jason Whipple to Craig Flynn (5/22/09):**

**Re: Windsor One Rot Problem**

"I see you are with us tonight Craig Flynn; What defines the difference between interior and exterior trim at Windsor?"

**RichN (5/29/09):**

**Re: Windsor One Rot Problem**

"I'm fortunate to be busy doing high end customs and remodels. I recently was called to a multi-million dollar water front custom home that we built. This home has miles of Windsor One material. In all my days I have never seen a product fail like this one. This house was 3 years old when it first showed signs of rot. I don't mean just a little, every where! I immeditaley called Windsor. It took months to have someone come out and look. It was not even a representative from Windsor but a 'Water Intrusion Specialist' they hired. Gee—guess he said–34 pages of the obvious! Everyones fault but theirs! We primed all cuts, caulked, flashed, bla bla bla!

"I stand behind all products that we build, big and small! I will stand behind this one! I'm now forced to hire a water intrusion specialist, attorney, and bring on board the insurance companies I had over the last several years.

"This product has be (sic) inspected by many; the home owners, other builders, various carpenter (sic) and they have all said the same thing; they have never seen a product fail this fast and to this degree!

"I find it difficult to express my frustration regarding this product.

"This should not be used and sold for out door (sic) use!

"Please contact me to fight the sale of this product for outdoor use!

"By the way, even the Windsor water intrusion specialist told me he would have not recommended using this product on the North side of the house–'Are you friggin kidding me!!!'"

**WarriorWithWood (5/29/09):**

**Re: Windsor One Rot Problem**

"I smell a class action suit brewin'"

**Rbsremodeling (5/29/09):**

**Re: Windsor One Rot Problem**

"It only looks that way until Windsor one puts their lawyers up one of these guys azzes."

**Jackby (5/31/09):**

**Re: Windsor One Rot Problem**

"In reply to rbsremodeling;
"They may have lawyers, but it seems like they also have a problem with the wood their selling us. I have never seen anything rot so fast, ever! If more contractors speak up, something could be done. I wonder how many of us just made the repairs without trying to make a claim? …."

**Alden Robbins (10/26/09):**

**Re: Windsor One Rot Problem**

"I just wanted to put in my two cents here. In the effort of full disclosure, I own an Eastern White Pine sawmill. My family has done the same thing for 5 generations. We harvest the trees and buy from local loggers, trees that have grown in the Maine climate and soils for an average of 100 years or so. While these are not 'old growth' by definition, they are certainly not plantation grown**.** I have not seen the rot issues with white pine trim that I have seen with radiata trim. It is grown at a much slower rate, in a harsh climate. I hate to see problems with fingerjointed imported wood impacting the reputation of wood trim in general, especially Eastern White Pine trim, grown, harvested, and manufactured right here in New England."

**Sweet Lou (11/17/09):**

**Re: Windsor One Rot Problem**

"there is more to the story….specific to the issue of 'rot' and 'decay' mentioned in this thread relating to the WindsorOne product, the specie in question is Radiata Pine. This plantation grown pine is an excellent specie for interior millwork, mouldings and boards. Unfortunately, untreated Radiata Pine is and has been used for exterior applications (trim–some siding profiles) for several years. But unlike Eastern White Pine, Redwood, and Cedar, it does not have the natural decay resistant properties so proven over time in these species. However, if properly **treated**, Radiata Pine is an excellent option for exterior trim applications. I would venture to say that the problems mentioned here with WindsorOne were on product (sic) that they have put into the marketplace without treatment (they make and sell both a treated and untreated product). ….WindsorOne has had the best reputation in the marketplace for years and are now finding out that even the best primed Radiata Pine will rot if used outside.

That is why they are now treating the product before priming. ….My point is…if properly treated, Radiata Pine is a great choice for exterior trim/siding applications….”

**Fabcon (5/9/10):**

**Re: Windsor One Rot Problem**

“TBF–thanks for the reply. When I started using W1 there was not an option of protected or unprotected, or at least everyone I spoke with at W1 didn’t give me that option, but I was told I could use it outside. When I got on the W1 bandwagon I spoke with quite a few people at W1 and they were telling me how great it was & they never had any problems–I even helped them get it into my local lumberyard, passed along some contact info to other builders & local architects, etc. After I started having all the problems–inside & outside–no one wanted to hear from me. I sent them a sample of the rotted boards with date stamps from the factory on the back & no reply. Spoke with a local sales rep last year at the JLC show & told him all my rotting problems, he took my card & no call. I can’t express how poorly W1 handled everything but the sale with me, their customer service was terrible. It seems to be an industry problem, salesman are your best friend to make the sale & have every excuse when something goes wrong. I knew better than to use PFJ outside, but the W1 looked great & they assured me it would perform great–shame on me for not trusting what I know. I will never use PFL outside again.”

**Bob428 (10/7/10):**

**Re: Windsor One Rot Problem**

“I started using Windsor one pine when it first came out, stopped using it when every house I used it on rotted out in two years or less. I have a house right now I have to go back to remove the product and replace it. The reps for this company are deceitful liars. You have to fight tooth and nail with them to make good on this garbage product. The first time we had to call them out, the rep tried to tell me the back of the boards were printed with the words prime all cuts. I told him it didn’t say that, and finally, after many conversations and a trip the cutomers [sic] home, when I ripped off a board and threw it at him, he fessed up. It wasn’t until that time that they started to stamp the back of the pine with prime all cuts. That was in 2007. The bottom line is that there is not only the potential for rot, it would seem that there is (sic) type of chemical reaction with perhaps the glue that makes this stuff rot in a way I have never seen in my life. I have been in this trade for 38 years. When it rots and the rot goes undetected for a while, it rots through everything, sheathing and studs. It’s time for a class action against Windsor Mill.”

**Bob428 to Skyhook (10/9/10):**

**Re: Windsor One Rot Problem**

"ShyHook:

"Most of the lumber companies here in Mass stopped selling the product. But I will concede that not every piece rots out. For example, in some instances 2 out of 4 pieces of window trim will rot out and 2 will not. If you use it for any type of water table application, kiss it goodbye. The end result here is that a nice intended interior product was marketed as an exterior product. There is nothing wrong with the application process; as a matter of fact that is exactly what the reps say???"

http://www.contractortalk.com/f11/windsor-one-rot-problem-58316/.

13.    On or around October 14, 2010, Craig Flynn responded specifically to some of the comments made by Bob428 as follows:

**Craig Flynn to Bob428 (10/14/10):**

**Re: Windsor One Rot Problem**

"My name is Craig Flynn; I am President & CEO at Windsor Mill, a family owned manufacturing business for 38 years. I have previously posted on this thread, and addressed a number of potential reasons for damage due to rot on the exterior of buildings.

…

…

"To clarify a few things:
- We have had 'paint your cuts' (in some form or another) on our products since 1996.
- Painting your cuts is not specific to WindsorONE, but that of all primed wood products, including recommendations from the Western Red Cedar Association, the US Forest Products Lab, and the Canadian Wood Council;
- There are no 'special' installation instructions for WindsorONE, only following best practices that have been recommended for the last 30+ years;

11

- There are no organics in our glues that would contribute to or cause decay."

http://www.contractortalk.com/f11/windsor-one-rot-problem-58316/. However, Craig Flynn avoided the main issue raised on the blog–whether WindsorONE trim board, made of untreated Radiata Pine, is not suitable as exterior trim board because it rots and decays.

14.    Defendants have also been informed by their authorized retailers or sellers of WindsorONE trim board, such as Johnson Lumber Co, National Lumber, LaValley, and others, that they have received complaints and reports from their customers of WindsorONE trim board rotting at alarming rates. Representatives from Johnson Lumber Co., National Lumber, and LaValley, also informed Defendants and Craig Flynn that they did not believe that WindsorONE trim board was fit or suited for use as an exterior trim board. Due to the volume and magnitude of the rot claims, Defendants set up a claims protocol, separate and apart from their warranty claim process, which is handled by their agent, Norcon, for each of these suppliers to deal with current and future claims related to the rotting and decay of the WindsorONE trim board products. As part of this claims process, Defendants agreed that the suppliers could supply replacement product that rotted regardless of how the product was installed.

15.    Notwithstanding the reports about the rotting of WindsorONE trim board, and being told by the construction and forestry industry that untreated Radiata Pine should not be used as trim board for exterior applications, Defendants continued, and continue to this very day, to market and sell WindsorONE trim board for exterior applications.

16.    This class action seeks common law and statutory damages, punitive damages, injunctive relief, costs, attorneys' fees, and other relief, as a result of Defendants' malicious, willful, deliberate, wanton, and flagrant conduct in causing consumers' offices, homes, and other buildings to be in a dangerous, defective, unsafe, and unfit condition for habitation.

## **PARTIES**

17.     Plaintiff Brian Begley is a citizen and resident of New Hampshire and owns a primary residence at 156 Kearsarge Mountain Road, Wilmot, New Hampshire, in which WindsorONE trim board is installed.

18.     Defendant Windsor Willits Company is a California Corporation, headquartered in Cotati, California. At all times relevant, Windsor Willits Company was engaged in the design, manufacture, marketing, and sale of WindsorONE and WindsorONE+ Protected trim board that has been installed on and in numerous offices, buildings, homes, and other structures throughout the United States, including New Hampshire.

19.     Defendant Windsor Surry Company is a Delaware Corporation, headquartered in Dendron, Virginia. At all times relevant, Windsor Surry Company was engaged in the design, manufacture, marketing, and sale of WindsorONE and WindsorONE+ Protected trim board that has been installed on and in numerous offices, buildings, homes, and other structures throughout the United States, including New Hampshire.

20.     Upon information and belief, customer complaints and warranty claims regarding WindsorONE and WindsorONE+ Protected trim board are processed in California at 7950 Redwood Drive, Suite 4, Cotati, CA 94931 or 661 Railroad Avenue, Willits, CA 95490.

21.     Upon information and belief, all marketing of WindsorONE and WindsorONE+ Protected trim board in the United States, including distribution of advertising, as well as marketing and promotional materials, has been managed by offices in California at 7950 Redwood Drive, Suite 4, Cotati, CA 94931.

## **JURISDICTION AND VENUE**

22.     Defendants conduct substantial business in this District, including, but not limited to, the marketing and sale of WindsorONE and WindsorONE+ Protected trim board products. This Court has jurisdiction over Defendants because they have intentionally availed themselves to the markets and laws of the State of New Hampshire.

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The matter in controversy in this class action exceeds $5,000,000.00, exclusive of interest and costs, and the vast majority of members of the class are citizens of states other than the state in which Defendants are incorporated and where Defendants' primary places of business are located.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and the property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

### Defendants' Trim Board Products

25.     Windsor Mill was founded in 1972, and from its inception, Windsor Mill produced finger-jointed wood trim boards and moldings for installation on wood structures as trim, fascia, soffit, rake board, corner board, band board, etc. Windsor Mill's predecessor company, founded by Raymond Flynn, used Redwood and Douglas Fir to manufacture its products, including trim board and moldings.

26.     In 1996, Windsor Mill began producing the WindsorONE line of pre-primed trim board products, which it still produces today. Windsor Mill markets and sells the pre-primed trim board for exterior application or use as fascia, soffit, rake board, corner board, band boards, and window and door trim/casing. Windsor Mill also markets and sells the same pre-primed trim board for interior applications.

27.     WindsorONE trim board is designed as a finger-jointed product, meaning that each board is made up of several shorter boards that are joined together using a finger joint and adhesive.

28.     WindsorONE trim board is manufactured or made from Radiata Pine, which is imported from Australia, New Zealand, and South America, specifically Chile.

29.     According to Windsor Mill's President and CEO, Craig Flynn, Windsor Mill took Radiata Pine trees from the Monterey Coast of California and planted them in South America.

30.    Defendants utilize an outer course cut of the juvenile Radiata Pine to manufacture their trim board products. In their marketing materials, Defendants claim that the outer course cut assures the dimensional stability of the product. The product's tagline was "Wood in its Prime."

31.    Defendants did not treat the Radiata Pine used to manufacture the WindsorONE trim boards with any wood preservative.

32.    All of the trim boards are manufactured according to the same manufacturing process, standards, and quality controls. The trim board manufacturing process is pictured on Windsor Mill's website, https://www.windsorone.com. As described by Craig Flynn, "the trim boards are manufactured by first cutting boards to remove knots and other wood imperfections, then finger-jointing and fastening together the resulting pieces with high grade waterproof glue. Lastly, the boards are triple primed (three coats) with exterior-grade primer paint, then shipped to distributors in plastic wrap…."

33.    The Radiata Pine imported by Defendants from Australia, New Zealand, and South America is plantation grown. As a result of being plantation grown, nearly all of the wood is sapwood with little heartwood.

34.    Radiata Pine sapwood has no rot resistance. Radiata Pine heartwood is rated as having slight or no rot resistance.

35.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants were aware or should have been aware that the Radiata Pine sapwood has no rot resistance and that its heartwood is rated as having slight or no rot resistance.

36.    The sapwood of Radiata Pine is classified as perishable; its heartwood is classified as non-durable.

37.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants were aware or should have been aware that the sapwood of Radiata Pine is classified as perishable and that its heart wood is classified as non-durable.

38.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that other manufacturers and sellers of exterior

trim board made of Radiata Pine in the United States, such as Fletcher LIFESPAN (LOSP), Bodyguard (LOSP), and Claymark Centurion (Tru-Core), were treating the Radiata Pine with Light Organic Solvent-Born Preservative (LOSP) and other wood preservatives such as Tru-Core.

39.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that manufacturers and sellers of exterior trim board made of Radiata Pine in Australia and New Zealand treated the Radiata Pine with Boron salts, Chromated Copper Arsenate (CCA), LOSP, Copper Azole, and other wood preservatives.

40.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that the building codes in Australia and New Zealand prohibit the use of untreated Radiata Pine for structural uses in home construction.

41.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that in Australia and New Zealand, Radiata Pine not treated with a wood preservative was not indicated for exterior use as trim, trim board, millwork, or moldings, but rather, was only indicated for interior applications.

42.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that in the United States, Radiata Pine had been successfully treated with various types of wood preservatives and used in the wood construction industry for over forty years.

43.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that in the United States, wooden doors and window parts have been treated with wood preservatives since the 1930's.

44.    Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that the Window & Door Manufacturer's Association, also known as the WDMA, publishes Industry Standard 4 ("I.S.4") for Water Repellant Preservative Non- Pressure Treatment for Millwork, as well as a list of the specific preservatives it has certified, which meet the requirements of I.S.4.

45.     Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that the American Wood Protection Association, also known as the AWPA, publishes industry standards for preservatives and treated wood products, including non-pressure treated millwork. In this regard, the AWPA lists the preservatives available to treat the wood and specifies the preservative treatment level using a hazard scale or level.

46.     Prior to and after the introduction of WindsorONE into the marketplace in 1996, Defendants knew or should have known that according to the AWPA, the service condition that applies to their WindsorONE trim board is UC3A—Exterior Above Ground, Coated with Rapid Water Runoff. This classification is for wood and wood based materials used in exterior construction that are coated and not in contact with the ground. As defined by the AWPA, "Such products may be exposed to the full effects of weather, but are in vertical exterior walls or other types of construction that allows water to quickly drain from the surface." Examples are coated millwork, siding, and trim. As such, Defendants knew or should have known that Radiata Pine, which is not rot-resistant, required preservative treatment to prevent it from decaying or rotting when used in exterior applications, and what treatment process and preservative was prescribed by the AWPA.

47.     Prior to and after the introduction of WindsorONE into the marketplace in 1996, it was widely known in the millwork industry, and Defendants knew or should have known, that it is possible to effectively treat Radiata Pine and other species of pine with preservatives to help prevent the wood from rotting and/or decaying.

48.     Prior to and after the introduction of WindsorONE into the marketplace in 1996, it was feasible for Defendants to treat the Radiata Pine with a wood preservative such as Boron salts, CCA, LOSP, Copper Azole, or another widely known and effective wood preservative, before priming and ultimately selling their WindsorONE trim board products.

49.     In 2005, Defendants introduced to the marketplace a second line of trim boards manufactured out of Radiata Pine; however, the boards were injected with a borate protectant.

Defendants introduced this line of products as a result of the claims, reports, and/or complaints regarding the rotting of their WindsorONE trim board products.

50.     In 2007, Defendants introduced to the marketplace and began manufacturing and selling a separate line of trim board products manufactured out of Radiata Pine; however, the Radiata Pine was treated with wood preservatives known as Tru-Core. This product was branded by Defendants as WindsorONE+ Protected ("WindsorONE+"). Defendants introduced this product line as a result of the claims, reports, and/or complaints regarding the rotting of its WindsorONE trim board.

51.     Defendants rebranded the WindsorONE trim boards as WindsorONE Traditional.

52.     Defendants provide a 30-year warranty against rot and decay for the WindsorONE+ Protected trim board products but do not provide any warranty against rot and decay for the WindsorONE Traditional trim board products. Yet, Defendants market and represent that both products are indicated and suitable for exterior use.

53.     The WindsorONE+ trim boards are made of or manufactured from the Radiata Pine imported from Australia and New Zealand. This is the same Radiata Pine which Defendants used to manufacture the WindsorONE trim board, now branded as WindsorONE Traditional.

54.     Except for the wood preservative treatment process, the manufacturing process for WindsorONE+ is the same as the manufacturing process for WindsorONE, now branded as WindsorONE Traditional.

55.     With the exceptions that the Radiata Pine substrate of WindsorONE+ is treated with a preservative and has three coats of factory-applied primer rather than two, the WindsorONE Traditional and WindsorONE+ products are otherwise the same. The treatment of the Radiata Pine with a wood preservative is the only difference between the two trim board products. The WindsorONE+ trim board product is made with the same fiber (wood), the same finger-jointing, edge glue, and primer as the WindsorONE Traditional trim board product.

**Defendants' Representations About Their Trim Board in Their Advertising and
Marketing Materials**

56.    Defendants marketed, advertised, represented, and specified that the
WindsorONE trim boards and moldings were suitable for exterior application on homes,
buildings, and other wood structures.

57.    Defendants marketed WindsorONE trim board as free of defects. Defendants
market and have marketed that their WindsorONE trim board "materials can provide you with
the durability and long term performance you require in a finger joint Trim Board–free of
defects and the potential callbacks they can cause."

58.    Further, Defendants market and have marketed that consumers should "Think
of WindsorONE end and edge glued boards as turbo wood. Not only does it have all the great
qualities of wood, but in addition, it benefits from structural stability, decreased cupping,
warping or twisting,... and it's defect free."

59.    Defendants market and have marketed that their WindsorONE trim board's
"joints are stronger than the wood itself, and waterproof." Defendants attribute this strength to
the fact that their trim board exceeds Wet Use Classification, ASTM D5572-95, stating that,
"WindsorONE exceeds the standards set by this test, and that's why our joints are stronger
than the wood itself, and waterproof!"

60.    In addition, Defendants advertise, and have advertised in the past, that
WindsorONE trim board is suitable for all interior and exterior application because of a
"unique blend of adhesives, designed for our specific manufacturing processes and your
specific end-use."

61.    Defendants specifically represent and have represented that WindsorONE trim board was suitable for exterior use in a variety of applications:



62.    In addition, Defendants also include in their marketing and/or product brochure a "Features and Benefits" list, which specifically states that WindsorONE is suitable for all exterior applications:

**Feature #7**
Windsor utilizes a unique blend of adhesives designed for our specific manufacturing processes and your specific end-use.

WindsorONE™ is suitable for all interior and exterior applications. Our Proprietary Adhesive System (PAS) ensures exacting application of our Type 1 PVA glues. We warrant our glue lines.

**When choosing a substrate, be sure to specify WindsorONE. Factory finished WindsorONE material can provide you with the durability and long term performance you require in a fingerjoint trim board - free of defects and the potential callbacks they can cause.**

63.     Defendants advertise and have advertised in the past that WindsorONE trim board is manufactured utilizing raw materials, which make it stable and consistent. Defendants advertise that the wood used to manufacture WindsorONE trim board is superior to products that are manufactured utilizing Cedar or Redwood.

64.     Defendants represent and have represented that "Today's Redwood and Cedar products are harvested from second and third growth forests, resulting in minimal vertical grain availability and minimal clear all heart cuts. Most redwood is sapwood and mixed grain. As a result, **they possess no advantages over WindsorONE**, and their lack of uniformity leads to inconsistent performance."

65.     Defendants advertise and have advertised that WindsorONE trim board is superior to products that are manufactured utilizing #2 Pine, Spruce or Fir.

66.     Defendants advertise and have advertised that they have a proven performance record with their WindsorONE trim board products.

67.     Defendants represent and have represented that "Windsor Mill is a proven performer. Our record of performance with some of the largest material dealers and custom homebuilders in the country is unsurpassed. Were it not for the continued development and improvement of our products, **strict adherence to our zero defects policy described below,** and top notch customer service, our business would not be growing at the exceptional rate that it continues to do. **the bottom line—we use the highest quality materials to produce the highest quality products."**

68.     Defendants state in their WindsorONE trim board warranty that "Windsor Mill guarantees WindsorONE's end and edge gluing for 10 years and its primer for 5 years."

69.     Defendants warrant that they "will replace, without charge, any WindsorONE product to be defective" within the period set forth in their warranty.

70.     Defendants and their authorized agents and sales representatives have made and continue to make the above described assertions, statements, representations, and warranties with the intent and purpose of inducing contractors, builders, and consumers to buy WindsorONE trim board, now branded as WindsorONE Traditional, from Defendants, to

install for exterior use or application on homes, apartments, office buildings, and other structures in New Hampshire and throughout the United States.

71.     In marketing the WindsorONE+ product, Defendants highlight and stress in "WindsorONE +PROTECTED FACTS: TOP 10 THINGS KURT "THE KILT" SAYS ABOUT +PROTECTED:", among other things, the following:

1.    PROTECTED TO THE CORE; FULL PENETRATION
Because unlike the other guys, we're assuming you'll actually want to cut the material at some point.

2.    PROTECTED AGAINST ROT, INSECTS & MOLD

Does not protect against your mother-in-law, hangovers, airport security, etc.

3.    DURABLE FOR EXTERIOR & SAFE FOR INTERIOR

Gold Indoor Air Quality Rating, low VOC's & California Hippie Approved.

8.    THE CUT SURFACES ONLY NEED PRIMING

No need to also apply special protection (we took care of that for you).

9.    BACKED BY A 30-YEAR LIMITED* WARRANTY

The "limitation" is you have to install it correctly (for an example, see note on

http://www.windsorone.com/things-kurt-says.php

72.     Each of the above five advantages that Defendants tout that WindsorONE+ holds over WindsorONE Traditional refers to, exposes, and corrects the fundamental flaw inherent in the WindsorONE Traditional product, namely, that its Radiata Pine substrate possesses no natural rot resistance and is not treated with a wood preservative. By treating the Radiata Pine substrate of WindsorONE+ with a wood preservative, Defendants are now imparting to it the rot resistance required for WindsorONE+ to be durable over the long term when used as exterior trim on wood-frame houses designed, constructed, and maintained using standard construction practices throughout the United States. Because the entire volume of each piece of WindsorONE+ is treated with a wood preservative, there is no rot-susceptible wood that can be exposed by site-cutting and fastening. Even if site-cuts made in WindsorONE+ trim board are not re-primed, its preservative-treated Radiata Pine substrate will not rot within the 4 to 5 years typically experienced with the WindsorONE Traditional

trim board product, as evidenced by WindsorONE+'s 30-year warranty against rot and termites, and its claim that the treated trim boards can provide 50 plus years of service.

73.     Despite the fact that WindsorONE Traditional's Radiata Pine wood substrate is not treated with a wood preservative like the WindsorONE+ trim boards, Defendants still represent and market WindsorONE Traditional as indicated and suitable for exterior use and application.

**Failure of the Trim Board Product**

74.     Contrary to Defendants' representations, WindsorONE trim board has in fact proven to be unable to withstand normal weather conditions and has absorbed moisture and water at an extremely rapid rate resulting in rotting and decay of the wood and damage to surrounding property.

75.     Contrary to Defendants' representations regarding the quality of wood used to manufacture WindsorONE trim board, the trim board is manufactured utilizing low-cost and low performance Radiata Pine. Instead of using a heartwood species of wood that is naturally rot-resistant, such as Western Red Cedar, Redwood, Douglas Fir, or Eastern White Pine, for example, Defendants manufactured WindsorONE trim board with Radiata Pine, which has no natural rot resistance.

76.     While it is not unheard of to use a wood species for exterior trim that is not naturally rot resistant, such products must be treated with an adequate preservative to eliminate the wood as a food source for fungi. Unfortunately, Defendants failed to treat the Radiata Pine they used to manufacture the WindsorONE trim board with any preservatives.

77.     Further, the adhesive used is non-waterproof and unsuitable for exterior use to glue small pieces of Radiata Pine into a long piece of trim board.

78.     Defendants claim they used a cross-linking polyvinyl acetate ("PVAc") that meets the ASTM D5572-95 industry standard.

79.     However, the D5572-95 standard does not confirm that an adhesive is waterproof—it only rates adhesives for water resistance. Water resistance is not sufficient for a product that is intended to be exposed to rain, snow, humidity, and freeze-thaw cycles. For

year-round exterior applications, a manufacturer must use a waterproof adhesive that meets the requirements of the more rigorous ASTM D2559 standard for Adhesives for Bonded Structural Wood Products for Use Under Exterior Exposure Conditions.

80. The inferior adhesive breaks down overtime and allows water to penetrate the untreated and rot susceptible Radiata Pine.

81. As a direct result of Defendants' decision to use a non-waterproof adhesive and a species of wood that is not rot-resistant, the WindsorONE trim board absorbs water overtime and the trim board installed on structures in New Hampshire and throughout the United States has prematurely decayed, rotted, split, warped, and become discolored.

82. The WindsorONE trim board begins to prematurely rot well in advance of its life expectancy or service life, which Defendants warrant for 10 years. Because the product is often installed on high parts of homes that are not easily visible to the human eye, such as roof soffits and fascia, homeowners may not immediately identify the rotted areas.

83. Over time, the rotted areas expand, ultimately requiring complete replacement of the trim board and costing homeowners and property owners tens of thousands of dollars in materials, labor, and disposal fees.

84. Such premature decay, rotting, splitting, warping, and discoloration also damages the structure on which the trim board is installed, causing the underlying structure to rot, buckle, deteriorate, and experience water damage.

85. The deterioration of Defendants' WindsorONE trim board exposes the areas of the home beneath it to the elements and allows moisture to enter the wall-system behind the trim board.

86. This causes the rest of the home, including the interior, to deteriorate.

87. The existence of Defendants' defective trim board on the structures of Plaintiff and the Class members also decreases the value of those structures.

88. Due to Defendants' use of a non-waterproof adhesive that is unfit for the intended application, a finger-jointed design, and a low-cost species of Pine which is not rot-resistant and not fit for its intended use, the trim board fails and the wood rots and decays well

in advance of its life expectancy or service life, which Defendants warrant for 10 years. All owners of structures containing the WindsorONE trim board have been damaged by the installation of the trim board on their structures and will continue to be damaged so long as the trim board remains installed on their structures.

**Defendants' Liability for Damages to Plaintiff and the Class**

89.     Defendants are responsible and liable for, among other things, the costs of removing and replacing the trim board installed on Plaintiff's structure and on Class members' structures, as well as consequential property and other damages caused by the defective product.

90.     By their wrongful actions and course of conduct alleged herein, Defendants have acted with malice, deliberately, willfully, knowingly, wantonly, and with flagrant disregard of the safety of persons who might be harmed by their product.

91.     As a direct and proximate result of Defendants' acts and/or omissions as alleged herein, Plaintiff and the Class members have sustained, are sustaining, and will sustain damages to their offices, homes, apartments, buildings, and other structures, as well as losses due to the necessity of removing and replacing the defective trim board installed on their structures.

92.     Had architects, contractors, builders, lumber yards, building supply stores, and other building and constructional professionals been aware of the true defective nature of Defendants' WindsorONE trim board, and the fact that it was not fit for its intended use as exterior trim board, they would not have recommended and/or specified it for installation on the exterior of a home, condominium, apartment, building, or other structure. In addition, had Plaintiff and the Class members been aware of the true defective nature of Defendants' trim board and the fact that it was not fit for its intended use as exterior trim board, they would not have purchased the trim board, a home containing the defective trim board, or they would have purchased the trim board or their homes containing the defective trim board at reduced prices.

93.     Defendants' liability to Plaintiff and Class members is not limited by Defendants' express warranty. Defendants' limitation of remedies in their express warranty is unconscionable and void.

94.     Plaintiff and many Class members were unaware of the limitation of remedies in Defendants' express warranty at the time they came to own their trim board. Plaintiff and many Class members purchased homes and other structures already containing trim board and did not see the limitations in Defendants' warranty prior to purchasing those structures. Moreover, many Class members had trim board purchased for them by contractors, builders, and architects for installation, and did not see the terms of Defendants' warranty prior to making such purchases. Accordingly, the limitations that Defendants seek to impose are invalid.

95.     Further, many Class members, including Plaintiff, did not negotiate or bargain for the terms of Defendants' express warranty, but rather, had to accept it as drafted by Defendants. As the less powerful and less sophisticated party to the transactions with Defendants, Class members were not able to analyze or bargain for the terms of Defendants' express warranty and thus should not be held to its terms. The terms of the express warranty are disproportionate and one-sided. Class members had no understanding of the rights Defendants' warranty required them to give up at the time they acquired their trim board.

96.     Defendants' limitation of remedies for a product it knew to be defective was imposed on Plaintiff and Class members in bad faith.

97.     Defendants' express warranty fails of its essential purpose by limiting the remedies available to consumers and erecting several barriers to its enforcement. The trim board's defective design and manufacture requires it to be completely replaced at costs exceeding what Defendants have contracted to pay pursuant to their express warranty. Moreover, the express warranty requires that the defective trim board be replaced with the same defective trim board.

**Plaintiff's Experience with Defendants' Trim Board**

98.      In 2004, Plaintiff began construction on a new home located at 156 Kearsarge Mountain Road, Wilmot, New Hampshire 03287.

99.      Plaintiff and his wife, Helene Begley ("Mrs. Begley"), moved into the home when construction was completed in February 2005.

100.      Plaintiff's home made extensive use of WindsorONE trim board.

101.      Plaintiff hired Paul Vandenberg ("Vandenberg") of Nehemiah Builders to build his home.

102.      Vandenberg purchased the building materials for the home, including the WindsorONE trim board, from RP Johnson & Son ("RP Johnson"), located in Andover, New Hampshire. RP Johnson has since been acquired by Belletetes, Inc.

103.      Vandenberg purchased the WindsorONE trim board because it was marketed as being the best product available for trim board and lots of local builders had been using it.

104.      Vandenberg's representative at RP Johnson, Steve Johnson ("Johnson"), told Vandenberg that WindsorONE was great for exterior use, was the best trim board product on the market for exterior use, and provided him with marketing materials and product brochures for WindsorONE trim board products. Based on this information and the representations, Vandenberg specified the WindsorONE trim board for Plaintiff's home and relayed to Plaintiff what he had been told about the product, as well as the information he read in the WindsorONE marketing materials, product brochures, and product warranty.

105.      Vandenberg and his client, Plaintiff, chose to purchase WindsorONE trim board based on the information Vandenberg received from Johnson and thereafter communicated to Plaintiff, which included the representations in the marketing materials and product brochures, including, among other things, that WindsorONE trim board was a superior product suitable for exterior use. Vandenberg and Plaintiff also considered and relied on the product warranty when deciding to specify and purchase WindsorONE trim board for the home.

106.    Vandenberg purchased the WindsorONE trim board from RP Johnson in or around August of 2004.

107.    A screenshot of the express product warranty posted on Defendants' website in or around 2004 stated as follows:



Home > Architect > Product Catalog > Warranty

**WindsorONE Warranty**

**Limited Warranty:**
Windsor Mill guarantees WindsorONE's end and edge-gluing for 10 years and its primer for 5 years. Windsor Mill will replace, without charge, any WindsorONE product that installed according to directions and fails to meet this warranty within that time. Such replacement is the exclusive remedy for breach of warranty, with no consequential or other damages recoverable.

**Warranty Disclaimer:**
Windsor Mill's guarantee is limited to the above Limited Warranty. In Windsor Mill's opinion, its statements about WindsorONE products on this website and in printed literature are believed to be accurate, but do not constitute separate warranties. There are no warranties, expressed or implied, including merchantability, beyond the above Limited Warranty.

**Products**

S4SSE

S1S2E

Specialty

Moldings

108.    At the time of the purchase of the WindsorONE trim board, RP Johnson was not stocking or selling WindsorONE+.

109.    Plaintiff's home contains WindsorONE trim board installed as exterior trim including, but not limited to, installations as fascia, soffit, corner boards, peak boards, skirt boards, vertical boards, and band boards.

110.    In or about the spring of 2007, Plaintiff first discovered that the WindsorONE trim board installed on the exterior of his home was rotting, deteriorating, and crippling at the ends. He noted that there were splits, warping, and areas where fungus and mushrooms were growing out of the wood.

111.    Plaintiff was concerned after this discovery, but he did not have enough information at this time to start investigating a lawsuit against Defendants.

112.    In the spring of 2008, Plaintiff noticed that the WindsorONE trim board on additional areas of his home was experiencing the same issues as he previously noticed in the

spring of 2007. Plaintiff immediately contacted Vandenberg to discuss the issues and schedule a time for him to conduct an inspection.

113.    Upon inspection, Vandenberg confirmed that he had used WindsorONE trim board on each of the areas that were deteriorating, decaying, and rotting, and offered to get in touch with RP Johnson and Defendants to try and remedy the issue.

114.    Thereafter, Vandenberg contacted RP Johnson and requested that one of Defendants' representatives be scheduled to inspect the rotting and decaying trim board on Plaintiff's home.

115.    In or around the spring of 2008, Defendants sent one of their representatives, Sean Pasell, out to Plaintiff's home to conduct an inspection.

116.    Thereafter, Vandenberg received an Inspection Report from Defendants' agent, Norcon Consulting Group (formerly known as Norcon Forestry Ltd.) ("Norcon") dated July 12, 2008, stating, among other things, the following:

> All of the trim damage observed was a direct result either of (i) water accumulating on the wood without drainage and eventually soaking into it, (ii) water entering behind trim boards installed without adequate drainage or (iii) water wicking into the wood from unprotected (unprimed) jobsite cuts. Thus, almost all of the damage to the trim boards may be attributed to poor design or construction practices over which Windsor had no control. As the observed damage is design or installation related, Windsor does not have practical responsibility.

117.    Thereafter, on August 18, 2008, Vandenberg received an Offer of Settlement and Release from Norcon stating, among other things, the following:

> Subject to obtaining a Release, Windsor Mill will provide to the builder of the site, 3 pieces of 5/4"x 6"–16'; 5 pieces of 5/4"x8"-16'; 3 pieces of 1"x4"-16'; 6 pieces of 1"x8"-16', and; 8 pieces of 1"x12"-16' WindsorONE+ Protected Trim Boards.

118.    Vandenberg presented the Offer of Settlement and Release to Plaintiff and Mrs. Begley and they asked if they could still receive the offered trim board credit/replacement boards without signing the documents.

119.    Vandenberg informed them that the only way RP Johnson could provide them with a trim board credit was if they signed both documents.

120.     Vandenberg then asked Plaintiff if he wanted to use his trim board credit on new WindsorONE trim board or another trim board product carried by RP Johnson. Plaintiff specifically told Vandenberg that he was no longer interested in using any WindsorONE products on his home.

121.     In or about September 2008, Plaintiff hired Vandenberg to do patch work and install new trim board on the areas of his home that had experienced the most rotting and deterioration.

122.     Vandenberg returned to Plaintiff's home and began replacing the worst of the rotting and deteriorating WindsorONE trim board with a finger-jointed primed Pine trim board product that he purchased from RP Johnson.

123.     In October 2008, Vandenberg billed Plaintiff approximately $3,000.00 for the patch work that he completed, including labor and materials. Vandenberg's patch work replaced only a fraction of the rotting and deteriorating WindsorONE trim board on Plaintiff's home.

124.     At some point in 2015, Mrs. Begley noticed that the rotting and deterioration of the WindsorONE trim board on the home had significantly worsened.

125.     Mrs. Begley contacted Defendants, expressed her concerns regarding the failing trim board, and was told that a report had previously been conducted on her home back in 2008.

126.     Mrs. Begley then spoke with Matt Jesson and he instructed her to take measurements of all the WindsorONE trim board on the home.

127.     On May 16, 2016, Plaintiff and Mrs. Begley received yet another Offer of Settlement and Release from Norcon, stating, among other things, the following:

> Windsor Mill will provide to the legal owners of the building on the Site, subject to obtaining a signed Release, a Material Credit for 400 linear feet of WindsorONE+ Protected trim boards, as set out in the attached Release document.

128.     Plaintiff and Mrs. Begley decided not to sign either of the documents as they felt that Norcon's settlement offer in the form of a material credit for 400 linear feet of

WindsorONE+ was an unreasonable offer as it covered only a small portion and cost of the damaged trim board.

129.    The WindsorONE trim board installed on Plaintiff's structure is failing, rotting, and decaying, despite being installed in accordance with Defendants' installation instructions.

130.    The failing trim board on Plaintiff's structure has resulted in damages not only to the trim board itself, but also to the structure on which the trim board is installed. The structure has sustained significant water damage and various portions of the structure are rotting as a result of the defective WindsorONE trim board installed on Plaintiff's structure.

131.    Removing all of the damaged trim board will also require custom moldings and additional custom built elements to be removed from Plaintiff's structure.

132.    At present, a portion of the defective WindsorONE fascia trim board on Plaintiff's structure has exhibited significant swelling and rotting.

133.    There is also significant swelling and rotting to the vertical boards on Plaintiff's structure.

134.    The soffits, corner boards, and band boards on Plaintiff's structure, as well as other trim located on Plaintiff's structure, have also exhibited damage.

135.    As demonstrated in the photographs below, the trim board installed on Plaintiff's structure has deteriorated, rotted, and decayed to an alarming degree:







136.     The damages to Plaintiff's structure will cost more than $20,000 to remediate, based on estimates given to Plaintiff; however, Plaintiff's damages continue to accrue.

137.     Defendants have failed to resolve Plaintiff's warranty claim as provided in their warranty and as required by the laws of the State of New Hampshire.

<u>**CLASS ACTION ALLEGATIONS**</u>

138.     Plaintiff seeks to bring this case as a class action, under Federal Rule of Civil Procedure 23, on behalf of himself and all others similarly situated. The proposed Class ("the Class") is defined as:

> All persons and entities in the State of New Hampshire who own or owned homes, apartments, office buildings, or other structures in which WindsorONE trim board is or was installed, from 2001 to the present.

**Numerosity**

139.    The use of Defendants' WindsorONE trim board has damaged and continues to damage a vast number of persons and entities in the State of New Hampshire that own offices, homes, apartments, buildings, and other structures, in which the trim board has been installed. The members of the Class are so numerous that joinder of all members is impracticable.

140.    The exact number of Class members is unknown as such information is in the exclusive control of Defendants. However, given the widespread use of WindsorONE trim board in the State of New Hampshire, and the size and reach of Defendants' operations, Plaintiff believes the Class consists of hundreds of consumers statewide, making joinder of Class members impracticable.

**Commonality and Predominance**

141.    The claims of Plaintiff and the Class members rely upon common questions of law and fact. Plaintiffs and all Class members are also entitled to a common form of relief, namely damages.

142.    The harm that WindsorONE trim board has caused, is causing, and will cause, is substantially uniform with respect to all Class members. Common questions of law and fact affecting the Class members include, but are not limited to, the following:

a.    Whether Defendants' WindsorONE trim board is defective;

b.    Whether the trim board has not or will perform in accordance with the reasonable expectations of ordinary consumers;

c.    Whether Defendants knew or should have known of the defective nature of their trim board before placing it into the stream of commerce for purchase by Plaintiff and the Class;

d.    Whether Defendants concealed from consumers and/or failed to disclose to consumers the defect;

e.    Whether Defendants have failed to prevent damages caused by the defective product they designed, manufactured, and sold into the stream of commerce;

f.    Whether Defendants have failed to warn consumers about the reasonably foreseeable dangers of using the trim board;

g.    Whether Defendants violated New Hampshire's Regulation of Business Practices for Consumer Protection, Consumer Protection Act ("CPA"), § 358-A, *et. seq.*;

h.    Whether Defendants have breached an express warranty;

i.    Whether any purported limitations on recovery under Defendants' express warranty were unconscionable;

j.    Whether Defendants' express warranty failed of its essential purpose;

k.    Whether Defendants' trim board is fit or suitable for its intended purpose as exterior trim board;

l.    Whether Defendants concealed from consumers and/or failed to disclose to consumers that their trim board was not fit for its intended purpose as exterior trim board;

m.    Whether Defendants breached the warranty of merchantability;

n.    Whether Defendants acted negligently;

o.    Whether Defendants were unjustly enriched by the sale of the defective trim board;

p.    Whether Defendants' conduct should be enjoined from further sales of the products; and

q.    Whether the members of the Class have sustained damages and, if so, the proper measure of such damages.

143.    These common questions of law and fact predominate over any individual questions that may exist or arise.

### Typicality

144.    Plaintiff's claims are typical of the claims of the Class members. All claims arise from the same factual background and legal theories. Plaintiff and all Class members sustained damages arising out of Defendants wrongful course of conduct. The harms suffered

by Plaintiff are typical of the harms suffered by Class members and Plaintiffs and Class members have an interest in preventing Defendants from engaging in such activity in the future.

### Adequacy of Representation

145.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel competent and experienced in class action and product liability litigation and has no conflict of interest with other Class members in the maintenance of this class action. Plaintiff has no relationship with Defendants except as a consumer who purchased Defendants' products. Plaintiff will vigorously pursue the claims of the Class.

### Superiority

146.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class to individually seek redress for the wrongs they have experienced. Plaintiff believes that Class members, to the extent they are aware of their rights against Defendants herein, would be unable to secure counsel to litigate their claims on an individual basis because of the relatively small nature of the individual damages, and that a class action is the only feasible means of recovery for the Class members. Individual actions would also present a substantial risk of inconsistent decisions, even though each Class member has an identical claim of right against Defendants.

### Manageability

147.    Plaintiff envisions no difficulty in the management of this action as a class action. The advantages of maintaining the action as a class action far outweigh the expense and waste of judicial effort that would result from a multitude of separate adjudications of these issues for each member of the Class or the injustice that would result if individual actions could not be brought due to lack of notice or resources.

148.    Class treatment further ensures uniformity and consistency in results and will provide optimum compensation to members of the Class for their injuries.

### EQUITABLE TOLLING AND ESTOPPEL OF STATUTES OF LIMITATION

149.    Despite knowing that its trim board was defective, Defendants concealed its defective nature from Plaintiff and Class members by affirmatively marketing and advertising their trim board as being proper for exterior use as building trim. Defendants also failed to apprise consumers of the trim board's inability to withstand normal conditions and its excessive absorption of moisture.

150.    Plaintiff and Class members did not and could not have known that their trim board was made with improper materials that would cause it to prematurely rot and deteriorate, as this fact was not disclosed to them and was not apparent from a superficial inspection of Defendants' trim board.

151.    Plaintiff and Class members could not have discovered the defective nature of Defendants' trim board through the exercise of due diligence.

152.    Due to Defendants' fraudulent concealment of the defects associated with their trim board, Defendants are estopped from asserting statute of limitations defenses to any of the claims alleged herein.

### FIRST CAUSE OF ACTION

### Violation of Regulation of Business Practices for Consumer Protection

### N.H. Rev. Stat. § 358-A, *et seq.*

153.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above. This claim for relief is brought against Defendants on behalf of all Class members.

154.    The conduct described above and throughout this Complaint took place within the State of New Hampshire and constitutes deceptive or false advertising, misrepresentations regarding the quality of goods, and unfair or deceptive acts or practices in the conduct of any trade or commerce, in violation of the Regulation of Business Practices for Consumer Protection ("New Hampshire CPA"), § 358-A:2.

155.    The New Hampshire CPA, § 358-A:2, applies to all claims of all the Class members because the conduct which constitutes violations of the code by Defendants occurred within the State of New Hampshire.

156.    The New Hampshire CPA, § 358-A:2, makes it unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce, including, but not limited to, the following: (V) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; (VII) representing that goods or services are of a particular standard, quality, or grade if they are of another; and (IX) advertising goods or services with intent not to sell them as advertised.

157.    Defendants are "persons" as defined by N.H. Rev. Stat. § 358-A:1(I).

158.    Defendants' advertising, offering for sale, sale, and distribution of the WindsorONE trim board product constitutes "trade" and "commerce" as defined by N.H. Rev. Stat. § 358-A:1(II).

159.    Defendants, when they marketed, advertised, and sold their trim board, represented to Plaintiff and Class members that the trim board was free of manufacturing defects and would be free of such defects for 10 years, even though the trim board was defective and prone to failure after only a couple years or sooner. Thus, the trim board was inherently defective and is prone to premature decay, rotting, splitting, warping and discoloration. At the time of their misrepresentations, Defendants were either aware that their trim board was defective or were aware that they lacked the information and/or knowledge required to make such a representation truthfully.

160.    Defendants' descriptions regarding the trim board were false, misleading, and likely to deceive Plaintiff and other reasonable consumers. Defendants' conduct therefore constitutes deceptive or misleading advertising.

161.    Plaintiff relied on Defendants' marketing representations regarding the trim board's durability, quality, and its ability to be used as an exterior trim product. The representations included, but are not limited to:

- o   Windsor Mill uses the highest quality materials to produce the highest quality products.

- o   no special precautions are necessary when working with WindsorONE versus composite trim boards.

- o   that WindsorONE is superior to wood and should be thought of "as turbo wood."

- o   WindsorONE is "defect free."

- o   WindsorONE has "all the great qualities of wood, but in addition, it benefits from increased structural stability, decreased cupping, warping or twisting …."

- o   WindsorONE "joints are stronger than the wood itself, and waterproof."

- o   WindsorONE is superior to #2 Pine, Spruce, or Fir, primed or unprimed.

- o   Redwood and Cedar products "possess no advantage over WindsorONE, and in [sic] in fact are inferior [to WindsorONE] when it comes to performance."

- o   "WindsorONE is suitable for all interior and exterior applications."

- o   WindsorONE provides "durability and long term performance …."

162.    As a direct and proximate result of Defendants' violations of the New Hampshire CPA, as set forth above, Plaintiff and Class members seek restitution of any monies wrongfully acquired or retained by Defendants by means of their deceptive or misleading representations, including monies already obtained from Plaintiff and Class members under § 358-A, or substantially similar Consumer Fraud and Deceptive Trade Practices Acts of the home states of Plaintiff and Class members who reside elsewhere but purchased the product in New Hampshire.

163.    Defendants' conduct in manufacturing, designing, engineering, fabricating, assembling, constructing, testing, examining, distributing, and/or marketing the trim board as described above, and throughout this Complaint, took place in the State of New Hampshire

and was an unfair, unlawful, or fraudulent business practice in violation of the New Hampshire CPA, § 358-A:2.

164.    Further, Defendants' concealment, intentional and negligent misrepresentation, and breach of express and implied warranties constitute unfair, unlawful, and fraudulent business acts and practices in violation of the New Hampshire CPA, § 358-A:2.

165.    Plaintiff relied on Defendants' marketing representations regarding the trim board's durability, quality, and its ability to be used as an exterior trim product, including such representations discussed in the facts above, and those that are summarized above.

166.    Plaintiff and the Class have been injured and have suffered loss of money or property as a result of Defendants' unfair, unlawful, and/or fraudulent business acts and practices.

167.    The New Hampshire CPA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result, or which results, in the sale of goods or services to any consumer as unlawful:

> a.    "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." § 358-A:2(V); and
>
> b.    "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." § 358-A:2(VII).

168.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire CPA, §§ 358-A:2(V) and (VII) when they represented through their advertising and other express warranties that the trim board had benefits and characteristics that it did not actually have.

169.    Defendants further violated the New Hampshire CPA when they falsely represented that the trim board was of a certain standard or quality, specifically stating that its product is superior to Cedar, Redwood, #2 Pine, Spruce, and Fir, primed or unprimed. Defendants went so far as to call their product "turbo wood."

170. Finally, Defendants violated the New Hampshire CPA when they advertised the trim board with the intent not to sell it as advertised.

171. Defendants' deceptive practices were specifically designed to induce Plaintiff and Class members to purchase their products.

172. Plaintiff relied on Defendants' marketing representations regarding the trim board's durability, quality, and its ability to be used as an exterior trim product.

173. Defendants engaged in marketing efforts to reach Class members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and install the trim board manufactured by Defendants, or to purchase homes or other structures on which the defective trim board had been installed.

174. To this day, Defendants continue to engage in unlawful practices in violation of the New Hampshire CPA. Defendants continue to conceal the defective nature of their trim board.

175. Plaintiff, on behalf of himself and all others similarly situated, demands that a permanent injunction be issued against Defendants to 1) refrain from continued advertising and representations that omit material facts about the defective trim board, and 2) injunctive relief forcing Defendants to replace and repair all defective trim board pursuant to N.H. Rev. Stat. § 358-A:10-a, or the substantially similar Consumer Fraud and Deceptive Trade Practices Act of the home states of Plaintiff and Class members.

176. As a direct and proximate result of Defendants' unfair, unlawful or fraudulent business practices as set forth above, Defendants have been unjustly enriched by receiving payment from Plaintiff and Class members as consideration for their purchase of the trim board. As such, Plaintiff and Class members are entitled to restitution of all consideration paid to Defendants under § 358-A2 or substantially similar Consumer Fraud and Deceptive Trade Practices Acts of the home states of Plaintiff and Class members.

177. Plaintiff and Class members also request appropriate injunctive relief to prevent Defendants from taking advantage of purchasers of its trim board in such a fashion as Defendants did in manufacturing and marketing the trim board to Plaintiff and Class members.

178.    Pursuant to the New Hampshire Consumer Protection Act, Plaintiff and Class members are entitled to recover compensatory damages, restitution, punitive and special damages including, but not limited to, treble damages, reasonable attorney's fees and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## SECOND CAUSE OF ACTION

### Breach of Express Warranty

179.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above. This claim for relief is brought against Defendants on behalf of all Class members.

180.    Defendants designed, developed, tested, manufactured, distributed, marketed, and sold trim board for purposes of its eventual sale to end users and installation in offices, homes, apartments, buildings, and other structures.

181.    Further, Defendants made the previously described express affirmations, statements, assertions, and representations concerning the trim board's durability, quality, and its ability to be used as an exterior trim product in their marketing and advertising materials, to induce consumers, including Plaintiff and Class members, to purchase their trim board. Such affirmations constitute express warranties.

182.    Defendants made the following affirmations of fact, descriptions, and promises regarding their trim board to Class members and their contractors and architects, in marketing materials made available to consumers such as Class members, and their contractors and architects:

- o   Windsor Mill uses the highest quality materials to produce the highest quality products;

- o   no special precautions are necessary when working with WindsorONE versus composite trim boards;

- o   that WindsorONE is superior to wood and should be thought of "as turbo wood;"

- o   WindsorONE is "defect free;"

- o WindsorONE has "all the great qualities of wood, but in addition, it benefits from increased structural stability, decreased cupping, warping or twisting …."

- o WindsorONE "joints are stronger than the wood itself, and waterproof;"

- o WindsorONE is superior to #2 Pine, Spruce, or Fir primed or unprimed;

- o Redwood and Cedar products "possess no advantage over WindsorONE, and in [sic] infact are inferior [to WindsorONE] when it comes to performance;"

- o "WindsorONE is suitable for all interior and exterior applications;"

- o WindsorONE provides "durability and long term performance …."

183.    "Lack of privity shall not be a defense in any action brought against the manufacturer, seller or supplier of goods to recover damages for breach of warranty, express or implied,... if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods." *Dalton v. Stanley Solar & Stove, Inc.*, 137 N.H. 467, 471 (1993) (citing N.H. Rev. Stat. Ann. § 382-A:2-318 (Supp. 1992)).

184.    Plaintiff and Class members relied on Defendants' representations regarding the durability and quality of their trim board and its suitability for use as an exterior trim product, as well as the existence of Defendants' warranty.

185.    Plaintiff's and Class members' contractors and/or architects also relied on Defendants' representations regarding the durability and quality of their trim board and its suitability for use as an exterior trim product, as well as the existence of Defendants' warranty.

186.    Defendants' affirmations became the basis of the bargain when Plaintiff, Class members, and/or Plaintiff's and Class members' contractors and/or architects purchased the trim board for offices, homes, apartments, buildings, or other structures containing the trim board.

187.    Defendants' trim board failed to comport with the affirmations, statements, assertions, and representations made by Defendants, and instead decayed and rotted prematurely and proved itself unfit for many of its recommended exterior trim applications.

188.    Defendants provided a defective product and failed to properly inspect, test, and identify defects in their trim board.

189.    Defendants were aware of the defective nature of the trim board at the time that the trim board was sold to Plaintiff and Class members.

190.    But for Defendants' conduct alleged herein, and their breach of express warranty, Plaintiff and Class members would not have suffered the damages and losses alleged herein.

191.    Defendants breached their express warranty by failing to provide trim board that was suitable for use as an exterior trim board, fascia board, edge board, soffit board, or cladding. Defendants further breached their 10-year express warranty by denying warranty claims based on improper installation when, in fact, no method of installation would avoid or cure the inherently defective nature of Defendants' design.

192.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and Class members have sustained, are sustaining, and will sustain damages and losses as alleged herein.

193.    Plaintiff and Class members have been damaged by Defendants' breach of express warranty, having unknowingly purchased a product that deteriorates prematurely and fails to perform as Defendants promised. Plaintiff and Class members are incurring or will be forced to incur unanticipated expenses associated with replacing Defendants' product, along with sustaining consequential damages caused by Defendants' trim board.

### THIRD CAUSE OF ACTION

**Breach of Warranty of Merchantability**

194.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above. This claim for relief is brought against Defendants on behalf of all Class members.

195.    Defendants designed, developed, tested, manufactured, distributed, marketed, and sold trim board for purposes of its eventual sale to end users and installation in offices, homes, apartments, buildings, and other structures.

196.    Defendants are merchants of building materials, including building trim.

197.    Defendants impliedly warranted that their trim board passed without objection in the trade and was fit for the ordinary purposes for which it is used—fascia, soffits, corner board, window trim, door trim, and any other exterior trim application. Specifically, Plaintiff and his contractor and/or architect relied upon Defendants' representations alleged above as the basis for Plaintiff's purchase of Defendants' trim board.

198.    Defendants knew and/or should have known that their trim board was defective and not of acceptable quality given that it was designed and manufactured with a sub-standard and defective adhesive, which rendered it unable to resist moisture as it was intended to do.

199.    Defendants knew and/or should have known that their trim board was not generally fit for the ordinary purposes for which it was intended to be used and did not pass without objection in the trade, as it was manufactured with sub-standard and defective materials that Defendants should have known would cause it to fail.

200.    Defendants' trim board was not merchantable at the time of sale given that it was constructed with a non-waterproof adhesive and a non-decay resistant species of low quality wood, which prevented it from being able to serve its ordinary purpose and from passing without objection in the trade.

201.    Defendants knew and/or should have known that their trim board would reach the end user without substantial change and in the condition in which it was sold.

202.    Defendants' trim board has failed in its ordinary and intended use as an exterior trim product, given that it cannot withstand normal weather conditions and absorbs water and moisture, which cause it to prematurely deteriorate, rot, and decay.

203.    Defendants' trim board has failed to pass without objection in the trade and is not of comparable quality to other exterior trim products in its line of trade. Unlike other trim

products, Defendants' trim board has absorbed water at an alarming rate, resulting in premature decay, rotting, splitting, warping, and discoloration.

204.    But for Defendants' conduct alleged herein, and their breach of the warranty of merchantability accompanying their trim board, Plaintiff and Class members would not have suffered the damages they have sustained to their structures, or related damages, as alleged herein.

205.    As a direct and proximate result of Defendants' breach of warranty of merchantability, Plaintiff and Class members have sustained, are sustaining, and will sustain damages to their structures, as well as related damages, as alleged herein.

### FOURTH CAUSE OF ACTION

#### Negligence

206.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above. This claim for relief is brought against Defendants on behalf of all Class members.

207.    Defendants owed the Plaintiff and Class members a duty of care to design, develop, test, manufacture, distribute, market, and sell a non-defective trim board product.

208.    Defendants also owed Plaintiff Class members a duty of care to warn them of the defects associated with their trim board product.

209.    Defendants breached their duty of care by negligently selecting materials for designing, developing, testing, distributing, marketing, and selling the defective trim board.

210.    Defendants also breached their duty of care by negligently failing to warn consumers, contractors, carpenters, and retailers that their trim board was defective and would fail and cause damages.

211.    Defendants were aware, or reasonably should have been aware, that their trim board was defective.

212.    When they purchased Defendants' trim board and/or structures clad with their trim board, Plaintiff and Class members were unaware of the trim board's defective nature.

213.    The failing trim board on Plaintiff's structure has resulted in damages not only to the trim board itself, but also to the structure on which the trim board is installed. The

structure has sustained significant water damage and various portions of the structure are rotting because of the defective trim board installed on the structure.

214.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class members have sustained, are sustaining, and will sustain damages and losses as alleged herein.

## FIFTH CAUSE OF ACTION

### Declaratory and Injunctive Relief

215.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above. This claim for relief is brought against Defendants on behalf of all Class members.

216.    Plaintiff, on behalf of himself and Class members, seeks a Court declaration of the following:

a.    All of Defendants' WindsorONE trim board is defective and is not fit for its intended use as fascia, soffits, corner board, band board, window trim, door trim, or any other typical exterior application, as its absorption of water and moisture makes it inappropriate for exterior use and causes it to rot, swell, buckle, and decay when employed in an exterior use;

b.    All of Defendants' WindsorONE trim board has a defect in workmanship and material that causes failures;

c.    Defendants knew of the defects in their WindsorONE trim board, Defendants' warranties failed of their essential purpose, and the limitations contained in the warranties were unconscionable and unenforceable;

d.    Defendants shall re-audit and reassess all prior warranty claims on their WindsorONE trim board, including claims previously denied in whole or in part where the denial was based on warranty or other grounds; and

e.    Defendants shall establish an inspection program and protocol to be communicated to Class members, which will require Defendants to inspect, upon request, a Class member's structure to determine whether a trim board failure is manifest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays that the Court:

A.    Declare, adjudge and decree that Defendants have committed the violations of state law alleged herein;

B.     Determine that under Federal Rule of Civil Procedure 23, this civil action may be maintained as a class action, and certify it as such;

C.     Order that judgment be entered for Plaintiff and the Class on their claims against Defendants;

D.     Enjoin Defendants from committing the violations of law alleged herein;

E.     Award Plaintiff and the Class damages, as determined at trial;

F.     Award Plaintiff and the Class restitution, as determined at trial;

G.     Award Plaintiff and the Class punitive damages, as determined at trial;

H.     Award Plaintiff and the Class their costs, including counsel and experts' fees, and pre- and post-judgment interest;

I.     Order Defendants to disgorge their ill-got gains and otherwise preclude Defendants from retaining their unjust enrichment; and

J.     Order such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues properly triable thereby.


Dated: July 17, 2017                    Respectfully submitted,

DOUGLAS, LEONARD & GARVEY, P.C.


/s/  Charles G. Douglas, III
Charles G. Douglas, III (NH Bar #669)
14 South Street, Suite 5
Concord, NH 03301
Telephone: (603) 224-1988
chuck@nhlawoffice.com

/s/ George T. Campbell, III
George T. Campbell, III (NH Bar #10488)
14 South Street, Suite 5
Concord, NH 03301
Telephone: (603) 224-1988
gcampbell@nhlawoffice.com

Michael A. McShane (CA State Bar #127944)
S. Clinton Woods (CA State Bar #256054)
AUDET & PARTNERS, LLP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 568-2555
mmcshane@audetlaw.com
cwoods@audetlaw.com


Shawn J. Wanta (MN Bar#0389164)
Hans W. Lodge (MN Bar#0397012)
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
sjwanta@baillonthome.com
hlodge@baillonthome.com


Charles E. Schaffer (PA Bar#76259)
LEVIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (877) 882-1011
cschaffer@lfsblaw.com


*Attorneys for Named Plaintiff and the Proposed Class*