Brian Begley

   v.                                    Civil No. 17-cv-317-LM
                                            Opinion No. 2018 DNH 057
Windsor Surry Company
d/b/a WindsorONE, & Windsor
Willits Company d/b/a Windsor Mill

## O R D E R

Plaintiff Brian Begley brings this action against defendants Windsor Surry Company d/b/a WindsorONE and Windsor Willits Company d/b/a Windsor Mill.  Begley raises a number of claims relating to allegedly defective wood products that defendants manufacture and sell.  Begley brings this action individually and on behalf of a putative class of New Hampshire consumers.  Defendants move to dismiss the amended complaint and to strike the class allegations.  Begley objects to both motions.  For the following reasons, the motion to dismiss is granted in part and denied in part, and the motion to strike is denied.

## Background

The following facts are taken from Begley's amended complaint, unless otherwise noted.  This action relates to certain wood products that defendants manufacture and sell: the

"WindsorONE line of pre-primed trim board products."  Doc. no.
17 at 14.  Since 1996, defendants have manufactured and sold
these trim boards for exterior construction—as fascia, soffit,
rake board, corner board, and window trim—as well as for
interior applications.

WindsorONE trim board is made from Radiata Pine wood.
Begley alleges that "nearly all" of the Radiata Pine that
defendants use is sapwood, which is the outer portion of the
tree stem.  Id. at 15.  Radiata Pine sapwood has no inherent rot
resistance.

To manufacture a board, defendants first cut wood from
juvenile Radiata Pine trees.  They cut a number of smaller
boards in a manner so as to remove knots and other imperfections
from the wood, and then glue these boards together with an
adhesive to make a single, "finger-jointed" board.  Id. at 14.
"[E]xterior-grade primer" is applied on the trim board before it
is delivered to distributors.  Id. at 15.

Defendants marketed and advertised the boards as suitable
for exterior application on buildings and other wood structures.
Defendants stated that, as a result of its manufacturing
process, WindsorONE trim board could be thought of as "turbo
wood," because it "benefits from structural stability, decreased
cupping, warping or twisting" and because it is "defect free."
Id. at 19.  Defendants advertised the board as providing

consumers with "the durability and long term performance [they] require in a finger joint Trim Board—free of defects." Id. Defendants also stated that the joints connecting the smaller pieces of the board together "are stronger than the wood itself, and waterproof." Id. Defendants advertised WindsorONE as superior to wood products made from other trees like cedar, redwood, pine, and fir. Defendants represented that they "use the highest quality materials to produce the highest quality products." Id. at 21 (bolding omitted).

Defendants provide a ten-year warranty for their end and edge gluing, and a five-year warranty for their primer. On their website, defendants state that they "will replace, without charge, any WindsorONE product that installed [sic] according to directions and fails to meet" the warranties. Id. at 28. Further, "[s]uch replacement is the exclusive remedy for breach of warranty," and "[t]here are no warranties, expressed or implied, including merchantability," beyond the glue and primer warranties. Id.

Begley alleges that, contrary to defendants' marketing, neither the adhesive glue nor the wood itself can withstand normal outdoor weather conditions. The adhesive glue, while water resistant, is not actually waterproof and therefore breaks down through exposure to rain, snow, and other conditions. This allows water to penetrate the pieces of the board, which—because

it has no resistance to rot—decays, rots, warps, and splits prematurely.  The deterioration of the board can then cause deleterious effects on the underlying structure.  Begley notes that treating the boards with a wood preservative could ameliorate this issue, but WindsorONE boards are not treated with any preservatives.  Begley claims that WindsorONE board is thus of lower quality than boards made with cedar, redwood, Douglas fir, or eastern white pine wood, which are naturally rot resistant.  Begley also alleges that defendants have known about these problems "for decades" but have nonetheless continued to market WindsorONE board as suitable for exterior applications. Id. at 3.

Begley's experience with defendants and WindsorONE trim board began in 2004.  In that year, Begley started construction on his new home in New Hampshire.  He hired Paul Vandenberg to build the home.  In August 2004, Vandenberg purchased WindsorONE trim boards through a local distributor and installed them throughout the exterior of the home.  In total, 9,712 linear feet of WindsorONE trim board were used on the home.

Before Vandenberg purchased the trim board, the local distributor told him that WindsorONE "was great for exterior use" and "was the best trim board product on the market for exterior use."  Id. at 27.  In addition, the distributor provided Vandenberg with WindsorONE marketing materials, product

4

brochures, and information regarding the product warranties. Vandenberg relayed the information he learned from these sources to Begley. They decided to purchase WindsorONE trim boards "based on the information Vandenberg received . . . and thereafter communicated to [Begley]." Id.

Vandenberg completed construction in February 2005, after which Begley and his wife moved into the home. In spring 2007, Begley noticed that some pieces of the trim board were rotting, deteriorating, or crippling at the ends. He also saw that there were splits, warping, and fungi growing out of some of the wood.

The next year, in spring 2008, Begley noticed that the damage he had observed previously was spreading to other areas of his home—in total, 384 linear feet were affected. He contacted Vandenberg, who conducted an inspection. Vandenberg confirmed that it was WindsorONE trim board that was deteriorating, and, on Begley's behalf, he filed a warranty claim with defendants for the 384 linear feet of deteriorated trim board. Vandenberg also requested that defendants send a representative to inspect Begley's home.

Defendants sent an agent from Norcon Forestry Ltd. ("Norcon") to inspect the property. After inspecting the property, the agent sent Vandenberg a report dated July 12, 2008. In the report, the agent concluded, "[A]lmost all of the damage to the trim boards may be attributed to poor design or

construction practices over which Windsor had no control.  As
the observed damage is design or installation related, Windsor
does not have practical responsibility."  Id. at 29.

In August, Norcon sent a letter to Vandenberg, which was
addressed to Vandenberg, Begley, and Mrs. Begley.  At the top of
the letter is the following disclaimer: "OFFER OF SETTLEMENT
MADE ON A WITHOUT PREJUDICE BASIS."  Doc. no. 17-1 at 2.
Enclosed with the letter is a release ("2008 Release").  The
letter informs Vandenberg and the Begleys that Windsor Mill
would supply 400 linear feet of new WindsorONE+ trim board[1] in
exchange for the execution of the release.  The letter states,
"This commitment is not an admission of liability by Windsor
Mill, is made without prejudice to any of Windsor Mill's legal
rights and is done solely in the interests of achieving an
amicable settlement."  Id.  The attached release provides as
follows:

> In consideration of Windsor Mill providing the following
> WindsoOne+ [sic] Protected Trim Boards . . .  Mr. and
> Mrs.   Begley   ("Homeowners"),   and   Mr.   Vandenberg
> ("Builder"),   as   "Releasors"   herein,   .   .   .   hereby
> releases and forever discharges Windsor Mill . . . and
> its affiliates, agents, successors and assigns from all
> claims,   debts,   causes   of   action,   agreements   and
> liabilities of whatever kind or nature, which they now
> have, may have or ever had, whether presently known or
> unknown to them, including any claims arising from any

---

[1] WindsorONE+ trim board is a separate wood product
manufactured by defendants.  The material difference between
WindsorONE and WindsorONE+ is that the latter is treated with a
wood preservative that reduces the wood's susceptibility to rot.

> purchase or installation of materials made or supplied
> by Windsor Mill for house construction at [Begley's
> property].

Doc. 17-2 at 2 (emphasis added). Vandenberg told the Begleys
that they could receive credit with the local distributor for
the 400 feet of trim board, but only if they signed the release.
The Begleys and Vandenberg then executed the release, and Begley
used the credit to purchase a different trim board product.

Begley alleges that, in fact, defendants' warranty-claim
process is an artifice, as defendants have "no intention of
providing the services set forth in their warranties." Doc. no.
17 at 2. Defendants allegedly deny warranty claims based on
improper installation despite the fact that "no method of
installation would avoid or cure the inherently defective nature
of [d]efendants' design." Id. at 45.

Regardless, seven years later, in 2015, Mrs. Begley noticed
additional deterioration of other WindsorONE trim boards on the
home. She filed a second warranty claim with defendants.
Norcon, again acting as defendants' agent, communicated with
Mrs. Begley in spring 2016 to resolve her claim. As in 2008,
Norcon sent another release for the Begleys to sign. In
exchange for the second release, the Begleys would receive
another 400 linear feet of WindsorONE+ trim board. Because the
offered trim board would only cover a small portion of the

deteriorating wood they had discovered, the Begleys declined to sign the second release.

In July 2017, Begley filed the present action, both on his own behalf and as a class action. In his amended complaint, Begley raises the following claims: (1) breach of express warranty; (2) breach of the implied warranty of merchantability; (3) negligence; and (4) declaratory and injunctive relief.[2] Begley defines the putative class as "[a]ll persons and entities in . . . New Hampshire who own or owned homes, apartments, office buildings, or other structures in which WindsorONE trim board is or was installed, from 2001 to the present." Id. at 34.

## Discussion

Defendants have filed a motion to dismiss and a motion to strike the class allegations from Begley's complaint. The court addresses each motion below.

### I. Motion to Dismiss

In support of their motion to dismiss, defendants argue: (A) the 2008 Release bars all of Begley's claims; (B) the

---

[2] The amended complaint also contains a count for violation of the New Hampshire Consumer Protection Act, but Begley indicates that he "has withdrawn his consumer protection claim." Doc. no. 27-1 at 13 n.2. Therefore, with respect to that claim, defendants' motion to dismiss is denied as moot.

statute of limitations bars all of Begley's claims; (C) the claim for breach of express warranty fails because the complaint does not sufficiently allege any representation that became the basis of the bargain; (D) the claims for declaratory and injunctive relief are inappropriate because Begley has adequate remedies at law, and Begley had no standing to seek injunctive relief; and (E) Begley is not entitled to seek punitive damages under New Hampshire law. After summarizing the standard of review, the court examines each argument in turn.

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addition, "[e]xhibits attached to the complaint are properly considered part of the pleading for all purposes, including Rule 12(b)(6)." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (internal quotation marks omitted).

A. <u>2008 Release</u>

A release may bar a subsequent action if it applies to the defendant, encompasses the claims asserted in the subsequent action, and is legally enforceable.  See Bourne v. Town of Madison, 494 F. Supp. 2d 80, 96 (D.N.H. 2007).  Defendants argue that the 2008 Release is enforceable and unambiguously covers the claims that Begley raises in this action.  Defendants broadly interpret the 2008 Release to cover "all claims (present and future, known and unknown) against [defendants] regarding any materials made or supplied by Windsor Mill."  Doc. no. 23-1 at 12.

Begley responds that the 2008 Release is ambiguous and that, considering the circumstances surrounding its execution and the parties' subsequent conduct, the 2008 Release should be interpreted to cover only claims "relating to the 384 linear feet of trim that failed as of the date of the Release."  Doc. no. 27-1 at 8.  In the alternative, Begley contends the 2008 Release is unconscionable and therefore unenforceable.

The court concludes that the 2008 Release unambiguously covers Begley's present claims, but that Begley has plausibly alleged that the 2008 Release is unconscionable.

1. Interpretation of the 2008 Release

Both parties rely on New Hampshire law in interpreting and assessing the enforceability of the 2008 Release.  When interpreting a contract under New Hampshire law, the court must "give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." Camden Nat'l Bank v. Greystone Select Holdings, LLC, No. 17-cv-272-JL, 2017 WL 5146166, at *2 (D.N.H. Nov. 3, 2017) (quoting In re Liquidation of Home Ins. Co., 166 N.H. 84, 88 (2014)).  "The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language." Id. (quoting Found. for Seacoast Health v. Hosp. Corp. of Am., 165 N.H. 168, 172 (2013)).  "Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract." Id. (internal quotation marks omitted).  "The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a question of law for [the] court to decide." Birch Broad., Inc. v. Capitol Broad. Corp., Inc., 161 N.H. 192, 196 (2010).

In this case, Begley does not argue that any particular term of the 2008 Release is ambiguous.  Rather, Begley contends that the scope of the 2008 Release becomes ambiguous in light of the surrounding circumstances, the parties' subsequent conduct,

and the parties' subjective intent.  For example, Begley

contends that the 2008 Release must be understood with reference

to the warranty claim which Begley had filed with defendants.

In Begley's view, the warranty allowed him to make a claim only

on "failed portion[s] of the trim," and he believed that the

2008 Release merely resolved his warranty claim to that extent.

Doc. no. 27-1 at 7.  For that reason, he "interpreted the

language [in the 2008 Release] as applying only to future claims

relating to the 384 linear feet of trim that failed as of the

date of the Release."  Id. at 8.  Begley asserts that his

interpretation is reasonable given that later, when his wife

filed a second warranty claim, defendants did not take the

position that the 2008 Release barred the claim but instead

worked with Begley and Mrs. Begley to resolve the new claim.

The court is not persuaded.  The language of the 2008

Release is unambiguous: Begley released defendants[3] from "all

claims . . . of whatever kind or nature," which expressly

included "any claims arising from any purchase or installation

of materials made or supplied by Windsor Mill" for the

_____

[3] The 2008 Release applies to defendant Windsor Mill as well
as its "affiliates, agents, successors and assigns."  Doc. no.
17-2 at 2.  Defendant argues, and Begley does not dispute, that
as a result, the 2008 Release also extends to defendant Windsor
Surry.

construction of his home.  Doc. no. 17-2 at 2 (emphasis added).

Begley identifies nothing in this language that is ambiguous.

Furthermore, the court declines to introduce ambiguity into

the 2008 Release by considering the extrinsic facts cited by

Begley.  The New Hampshire Supreme Court has stated that, while

"[e]xtrinsic evidence is admissible when it serves to aid in

interpretation, or to clarify an ambiguity," it may not be used

to "contradict unambiguous terms of a written agreement."

Behrens v. S.P. Constr. Co., Inc., 153 N.H. 498, 501 (2006)

(quoting Ouellette v. Butler, 125 N.H. 184, 187-88 (1984)); see

also Clearview Software Int'l, Inc. v. Kfoury, No. 2015-0682,

2016 WL 5723948, at *2 (N.H. Aug. 18, 2016) (unpublished

opinion) (concluding that, because contract was unambiguous,

trial court did not err when it declined to consider the context

in which the contract was executed).

In short, Begley's present claims, which arise from the

purchase of Windsor Mill materials for the construction of his

home, unambiguously fall within the scope of the 2008 Release.

## 2. Unconscionability of the 2008 Release

Turning to Begley's second argument, the court concludes

that the complaint gives rise to a plausible claim that the 2008

Release is unconscionable.  The parties do not appear to dispute

that RSA 382-A:2-302 governs the question of unconscionability

with respect to the 2008 Release.  Under that statute, a court may determine whether a contract is unconscionable, and, if so, the court may refuse to enforce the contract, strike the unconscionable clause, or limit the application of the unconscionable clause "as to avoid any unconscionable result." RSA 382-A:2-302(1).  The statute is intended to prevent unfair surprise and oppression, not to disturb the allocation of risks resulting from superior bargaining power.  See Colonial Life Ins. Co. of Am. v. Elec. Data Sys. Corp., 817 F. Supp. 235, 241 (D.N.H. 1993).  Unconscionability presents a question of law for the court.  See RSA 382-A:2-302(1) & cmt. 1; Zapatha v. Dairy Mart, Inc., 408 N.E.2d 1370, 1375 (Mass. 1980) (discussing Massachusetts analogue to RSA 382-A:2-302).

The New Hampshire Supreme Court has recognized that unconscionability generally includes "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Pittsfield Weaving Co., Inc. v. Grove Textiles, Inc., 121 N.H. 344, 346 (1981).  In deciding whether a party lacks a meaningful choice, courts consider, among other things, the existence of a gross inequality of bargaining power, the absence of negotiation ("take it or leave it"), a disparity in the relative experience of the parties, and other facts indicative of coercion or unfair surprise.  See id. at 347-48; see also United States v. Berry,

No. 06-cv-211-JD, 2008 WL 4526178, at *5-6 (D.N.H. Oct. 2, 2008); State Farm Mut. Auto. Ins. Co. v. Koshy, 995 A.2d 651, 668-69 (Me. 2010) (applying New Hampshire law). When deciding whether a contract is unreasonably favorable to another party, "courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." 63 Am. Jur. 2d Products Liability § 742; see also Am. Home Improvement, Inc. v. MacIver, 105 N.H. 435, 439 (1964).

Here, construing all reasonable inferences in Begley's favor, the terms of the 2008 Release are disproportionately favorable to defendants. As defendants acknowledge, the 2008 Release absolves them of all liability for "all claims (present and future, known and unknown)," of apparently any variety. Doc. no. 23-1 at 12. The 2008 Release thus not only allocates all of the risk relating to the trim boards to Begley, but it purports to do so as to all future claims against defendants. Begley alleges that, in exchange, he received about as much replacement trim board as he was already entitled to under the warranty. These allegations, viewed favorably to Begley, support a claim that the terms of the 2008 Release are unreasonably favorable to defendants. Cf. MacIver, 105 N.H. at 439 (concluding that contract for home improvements was

unconscionable given disparity between what homeowners paid and what they received under arrangement).

Similarly, taking the allegations as true and construing all reasonable inferences in Begley's favor, the complaint plausibly alleges that Begley lacked a meaningful choice when he executed the release.  The critical allegation is that Begley was only given the 2008 Release to sign after he had been falsely informed that poor installation—and not a defect covered by the warranty—was to blame for the deterioration of the WindsorONE boards.  With no apparent basis to insist upon the original terms of the warranty, Begley's only choice was to accept the new terms offered by defendants: receive replacement boards in exchange for the execution of the 2008 Release.  Thus, to the extent that Begley otherwise had a choice in deciding whether to execute the 2008 Release, defendants arguably restricted that choice by misrepresenting that Begley had no valid warranty claim and, by implication, no other recourse should he decline to accept it.  Cf. Ting v. AT&T, 319 F.3d 1126, 1149 (9th Cir. 2003) (finding arbitration agreement procedurally unconscionable where company intentionally dissuaded customers from switching to competitor that did not require arbitration agreement).

To be sure, there are facts suggesting that defendants did not coerce or unfairly surprise Begley.  Begley received the

settlement offer by letter, he had a few weeks to consider its terms, and the 2008 Release is itself short and unambiguous. In addition, in 2016, when offered more replacement boards in exchange for a second release, Begley appears to have felt free to decline the offer and instead pursue litigation.

Nevertheless, the court declines to resolve these questions at present. Although one of law, the question of unconscionability is a "fact-laden" determination. Koshy, 995 A.2d at 669. Indeed, RSA 382-A:2-302 contemplates that the court will not resolve the issue at this early stage: "When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." RSA 382-A:2-302(2).

Therefore, in light of Begley's plausible claim that the 2008 Release is unconscionable, the court declines to grant the motion to dismiss on the basis of the 2008 Release.

### B. Statute of Limitations

Defendants next argue that each claim is barred by its respective statute of limitations. Before addressing these arguments, it will be helpful to restate the relevant dates alleged in the complaint. In spring 2007, Begley first

discovered rotting on some pieces of WindsorONE trim board on his home (approximately ten years before the filing of the complaint).  In spring 2008, Begley noticed deterioration on additional trim boards, and Vandenberg filed a warranty claim with defendants (nine years before complaint).  In July 2008, Norcon sent the purportedly false inspection report to Vandenberg (nine years before complaint).  "At some point in 2015," Mrs. Begley noticed further rotting and deterioration on WindsorONE trim board installed on the home, and she filed a second warranty claim (approximately two years before complaint).  Doc. no. 17 at 31.  Begley claims that it was not until the discovery of further rotting in 2015 that he had "obtained the information essential to bringing suit."  Doc. no. 27-1 at 13.  Begley filed this action in July 2017.

### 1. Negligence, Declaratory and Injunctive Relief

Defendants contend that Begley's claims for negligence and declaratory and injunctive relief are barred by the three-year statute of limitations set forth in RSA 508:4, I.  Begley asserts that his claims are timely under the discovery rule, as well as under the doctrines of fraudulent concealment and equitable tolling.

Under RSA 508:4, I, "all personal actions . . . may be brought only within 3 years of the act or omission complained

of." However, the statute contains an exception known as the discovery rule, which "tolls the limitations period until a plaintiff discovers, or should reasonably have discovered, the causal connection between the harm and the defendant's negligent or wrongful act." Beane v. Dana S. Beane & Co., P.C., 160 N.H. 708, 713 (2010); see also RSA 508:4, I. "[A]pplication of the discovery rule presents a question of fact." Gould v. N. Human Servs., No. 2015-0698, 2016 WL 5831602, at *1 (N.H. Aug. 22, 2016) (unpublished opinion); see also Black Bear Lodge v. Trillium Corp., 136 N.H. 635, 638 (1993).

Distinct from the discovery rule are the doctrines of fraudulent concealment and equitable tolling. The former doctrine "states that when facts essential to the cause of action are fraudulently concealed, the statute of limitations is tolled until the plaintiff has discovered such facts or could have done so in the exercise of reasonable diligence." Beane, 160 N.H. at 714. Along similar lines, equitable tolling "allows a plaintiff to initiate an action beyond the statute of limitations deadline . . . [where] the claimant was prevented in some extraordinary way from exercising his or her rights." Portsmouth Country Club v. Town of Greenland, 152 N.H. 617, 623 (2005). Like the discovery rule and the doctrine of fraudulent concealment, "equitable tolling is applicable only where the

prospective plaintiff did not have, and could not have had with due diligence, the information essential to bringing suit." Id. at 624.

Defendants argue that fraudulent concealment and equitable tolling do not apply because the complaint does not sufficiently allege any sort of wrongful conduct by defendants which would trigger those doctrines. Defendants also assert that Begley's claims for tolling under any theory must fail because Begley was on notice of a potential claim by spring 2008, which is when Begley filed his warranty claim with defendants. Therefore, defendants assert that the statute of limitations ran years before Begley filed this action.

Taking the allegations in the light most favorable to Begley, the complaint plausibly alleges that, as tolled, Begley's claims were timely filed. There are sufficient allegations supporting Begley's arguments that defendants actively thwarted his ability to discover essential information and that he was not otherwise on notice of a claim until 2015. Ultimately, the application of the above tolling doctrines will turn on a number of factual issues, including the extent of Begley's knowledge of the defects in the trim boards, the degree to which he participated in investigating and pursuing the 2008

warranty claim with Vandenberg,[4] and the effect of the allegedly false inspection report on Begley.  See [Kelleher v. Marvin Lumber & Cedar Co.,](#) [152 N.H. 813, 826 (2005)](#) (noting that issue of whether plaintiff should have known of connection between window rot and defendant's use of a defective preservative "is a factual determination that necessarily turns upon an evaluation of the evidence").  Given these outstanding disputes of fact, defendants are not entitled to dismissal under RSA 508:4 at this juncture.

## 2.  Breach of Express and Implied Warranties

Defendants assert that the claims for breach of express warranty and breach of the implied warranty of merchantability are barred by the four-year statute of limitations fixed by RSA 382-A:2-725.  See RSA 382-A:2-725(1), (2) (stating that, for breach of warranty claim, action must be commenced within four years of tender of delivery).  In other words, defendants argue that because Begley received the product in 2004, the statute of limitations ran in 2008, years before Begley filed the present suit.

---

[4] It is also worth noting that there are two separate warranties at issue: the glue warranty and the primer warranty. It is unclear from the complaint which type of warranty claim Vandenberg filed on Begley's behalf.

Begley argues that fraudulent concealment and equitable tolling apply to render his warranty claims timely.[5]  Leaving aside the arguments the court has already addressed in Section I(B)(1), *supra*, defendants respond only that such doctrines do not apply to statutory warranty claims.  Defendants cite Lockheed Martin Corp. v. RFI Supply, Inc., 440 F.3d 549 (1st Cir. 2006), as support for that proposition.

In *Lockheed*, the First Circuit reviewed the district court's conclusion that RSA 382-A:2-725 barred the plaintiff's implied-warranty claim.  Although the action was filed more than four years after the plaintiff received the product, the plaintiff argued that equitable tolling should apply to toll the statute of limitations.  See *Lockheed*, 440 F.3d at 556-57.  The First Circuit agreed with the district court that this argument did not have merit because there were insufficient facts to support a claim for equitable tolling.  Id. at 558.

In addition, however, the First Circuit concluded that equitable tolling is inapplicable to implied-warranty claims governed by RSA 382-A:2-725.  See id.  In reaching this

---

[5] With respect to his breach-of-express-warranty claim, Begley also contends that his claim falls under an exception to the four-year rule for an express warranty that "explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance."  RSA 382-A:2-725(2).  Given the court's conclusion on the application of fraudulent concealment and equitable tolling, the court need not address this argument.

conclusion, the court noted that the statute of limitations for implied-warranty claims begins to run at tender of delivery, regardless of the aggrieved party's lack of knowledge of the breach.  See id.; RSA 382-A:2-725(2).  Further, the First Circuit stated that, "[g]iven the fact that the New Hampshire Supreme Court has recently stated that the discovery rule is not applicable in implied warranties claims . . . it is likely that the court would also find that equitable tolling is inapplicable."  Lockheed, 440 F.3d at 558.

Begley urges the court to refrain from applying Lockheed, arguing that the First Circuit erred in its interpretation of RSA 382-A:2-725.  However, in light of the First Circuit's decision and the absence of any intervening state authority to the contrary, this court considers it appropriate to follow the "Erie guess" of the First Circuit.  Potomac Ins. Co. v. Woods, No. 1:95-cv-469, 1996 WL 450687, at *5 (E.D. Tex. July 22, 1996) ("Adherence by a federal district court to a circuit court's 'Erie guess' is typically the norm."); see Travelers Cas. & Surety Co. v. Elkins Constructors, Inc., No. IP97-1807-C-T/G, 2000 WL 748091, at *6 (S.D. Ind. June 6, 2000).  Thus, based on the First Circuit's reasoning in Lockheed, the court concludes that Begley cannot invoke equitable tolling or fraudulent concealment to save his otherwise time-barred implied-warranty

claim.  Therefore, the court grants the motion to dismiss with respect to that claim.

The same result does not obtain with respect to the express-warranty claim.  Lockheed only concerned an implied-warranty claim, and there is reason to conclude that the New Hampshire Supreme Court would find fraudulent concealment and equitable tolling applicable to express-warranty claims.  First, RSA 382-A:2-725 expressly states that it does not "alter the law on tolling of the statute of limitations," RSA 382-A:2-725(4), and other courts have interpreted that language to allow for application of fraudulent concealment and equitable tolling, see, e.g., JN Expl. & Prod. v. W. Gas Res., Inc., 153 F.3d 906, 914 (8th Cir. 1998); MRL Dev. I, LLC v. Whitecap Inv. Corp., No. 2013-48, 2014 WL 6461583, at *8-9 (D.V.I. Nov. 18, 2014).  Second, the New Hampshire Supreme Court has long found tolling appropriate in cases of fraudulent concealment, so that the wrongdoer does not receive "the advantage and benefit" of his fraudulent conduct.  Lakeman v. La France, 102 N.H. 300, 303 (1959) ("It is well established that our courts will not countenance fraudulent conduct.").  Third, the New Hampshire Supreme Court has applied other tolling principles to contract actions.  See, e.g., Black Bear Lodge, 136 N.H. at 637 (discovery rule); A & B Lumber Co., LLC v. Vrusho, 151 N.H. 754, 756 (2005) (acknowledgement of debt); Chase Home for Children v.

N.H. Div. for Children, Youth, & Families, 162 N.H. 720, 729 (2011) (pending administrative proceedings).

For these reasons, with respect to his express-warranty claim, Begley may rely on the doctrines of fraudulent concealment and equitable tolling to resist defendants' statute-of-limitations argument.  Because there are sufficient facts to plausibly support such theories, see Section I(B)(1), supra, the court declines to dismiss the express-warranty claim on the basis of RSA 382-A:2-725.  As discussed, however, Begley's implied-warranty claim is dismissed.

### C. Existence of Express Warranty

Defendants argue that the complaint does not sufficiently allege that any representation by defendants became the basis of the bargain, an essential requirement to create an express warranty under RSA 382-A:2-313.  Begley counters that he has adequately alleged the existence of express warranties for purposes of RSA 382-A:2-313.  The court agrees with Begley.

RSA 382-A:2-313 provides:

(1) Express warranties by the seller are created as follows:

    (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

RSA 382-A:2-313(1)(a)-(b). "To create an express warranty, the seller is not required to use formal words, such as 'warranty' or 'guarantee' or have the specific intention to create a warranty." Kelleher, 152 N.H. at 841 (citing RSA 382–A:2–313(2)). "Further, an affirmation of the value of the goods or a statement of the seller's opinion or commendation of the goods does not create a warranty." Id. (citing RSA 382-A:2-313(2)). "Therefore, to create an express warranty, the promise or affirmation of fact must both relate to the goods and become part of the basis of the contractual bargain." Id.

A guarantee, promise, or description "becomes part of the basis of the bargain if it would naturally induce the purchase of the product." Id. at 841. The New Hampshire Supreme Court has stated that "no particular reliance by the buyer on such statement needs to be shown," so long as the buyer has become aware of the statement at some point in the bargaining process. See id. at 841, 843-44. Where the statement is made in marketing materials, a buyer need only demonstrate that he "read, heard, saw or was otherwise aware of the [statement] in

the catalog or brochure." Id. at 844.  Once that is

demonstrated, it is presumed that the statement has become part

of the basis of the bargain, which presumption the seller may

overcome with evidence "that the resulting bargain did not rest

at all on the seller's statement[]."  Id. at 843.

        In this case, there are sufficient allegations that Begley

became aware of defendants' marketing materials during the

bargaining process.  Specifically, the complaint alleges that

Vandenberg "relayed to [Begley]" the information he learned in

defendants' "marketing materials, product brochures, and product

warranty."  Doc. no. 17 at 27.  The complaint further states

that Begley "chose to purchase WindsorONE trim board based on

the information Vandenberg received . . . and thereafter

communicated to [Begley]."  Id.  And, taking the allegations in

the light most favorable to Begley, the marketing materials on

which he and Vandenberg relied contained the particular

representations that underlie Begley's express-warranty claim.[6]

---

[6] Among these are that WindsorONE boards are "defect free,"
are "suitable for all . . . exterior applications," provide
"durability and long-term performance," are "superior to wood,"
and have joints that are waterproof.  Doc. no. 17 at 43-44.

Thus, the complaint is sufficient, and the express-warranty claim will not be dismissed on that ground.[7]

### D. Declaratory and Injunctive Relief

On two grounds, defendants argue that Begley's requests for declaratory and injunctive relief fail as a matter of law: (1) Begley's other causes of action provide adequate remedies at law, precluding equitable relief; and (2) Begley has no standing to seek injunctive relief because he has failed to allege that he is likely to purchase defendants' products again. Begley responds that his requests for equitable relief are proposals for relief on behalf of a possible 23(b)(2) class.

Defendants' first argument does not justify dismissal of Begley's requests for declaratory and injunctive relief. The mere fact that Begley has pleaded claims for monetary relief does not necessarily demonstrate that he has adequate remedies at law. A party may plead alternative, even inconsistent, forms of relief. See Fed. R. Civ. P. 8(d)(3). Further, any searching

---

[7] Defendants also suggest that Begley's claims must fail because defendants disclaimed all express warranties beyond their glue and primer warranties. The court disagrees. Such a disclaimer is not given effect when it is inconsistent with language creating an express warranty. See RSA 382-A:2-316 cmt. 1; 1 White, Summers, & Hillman, Uniform Commercial Code § 13:2 (6th ed.) (noting that once a "fact finder determines that a seller's statement created an express warranty, words purportedly disclaiming that warranty" will be held "inoperative").

analysis into the merits of Begley's requests for declaratory and injunctive relief would be unnecessary and premature at this stage.  See Upjohn Co. v. Mova Pharm. Corp., 899 F. Supp. 46, 48 (D.P.R. 1995); Degenhart v. AIU Holdings, Inc., No. C10-5172RBL, 2010 WL 4852200, at *3 (W.D. Wash. Nov. 26, 2010).

Nor is the court persuaded by defendants' argument on standing.  Although Begley may not wish to purchase WindsorONE trim boards again, the complaint alleges that WindsorONE trim boards are still installed on his home and are continuing to deteriorate; defendants develop no argument as to why those allegations do not suffice to show that Begley is "likely to suffer future injury."  Marradi v. K&W Realty Inv. LLC, 212 F. Supp. 3d 239, 242 (D. Mass. 2016).

E. Punitive Damages

Defendants argue that New Hampshire law does not permit punitive damages under these circumstances.  Begley does not dispute, or even address, defendants' contention.

Under RSA 507:16, "No punitive damages shall be awarded in any action, unless otherwise provided by statute."  Given that Begley does not contest defendants' argument, let alone identify a source for punitive damages, the court grants defendants' motion to dismiss Begley's request for punitive damages.

F. Conclusion

In sum, the court grants the motion to dismiss only to the extent it seeks dismissal of the implied-warranty claim and the request for punitive damages.

II.  Motion to Strike Class Allegations

Defendants request that the court strike the class allegations from the complaint.  They raise four grounds: (1) the proposed class is overbroad and contains members who lack standing; (2) Begley is an atypical and inadequate class representative; (3) the proposed class is unascertainable and cannot satisfy the numerosity requirement; and (4) the proposed class cannot satisfy the superiority and predominance requirements of Rule 23(b)(3).

As explained below, the court concludes that defendants' objections to Begley's proposed class action are premature, and should be resolved at the class-certification phase.

A. Standard of Review

The First Circuit has held that district courts may "use their authority under Federal Rule of Civil Procedure 12(f) to delete the complaint's class allegations." Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 59 (1st Cir. 2013).  Nevertheless, courts must exercise caution in doing so.  See id.  The practice is disfavored "because it requires a reviewing court to

preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." Id. (quoting Mazzola v. Roomster Corp., 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012)). As a result, a district court should only strike class allegations where "it is obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis." Id.

"To obtain class certification, the plaintiff must establish the four elements of Rule 23(a) and one of several elements of Rule 23(b)." Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003). "The Rule 23(a) elements are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." Id. Further, in order to certify a 23(b)(3) class, the court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In re Nexium Antitrust Litig., 777 F.3d 9, 18 (1st Cir. 2015) (quoting Fed. R. Civ. P. 23(b)(3)).

B. Analysis

As a general matter, the issues raised by defendants are more properly addressed on a motion for class certification, rather than a motion to strike. While the court must engage in a "rigorous analysis" on a motion for class certification, Gintis v. Bouchard Transp. Co., Inc., 596 F.3d 64, 66 (1st Cir. 2010), the First Circuit has emphasized that the resolution of class issues on a motion to strike is "rare" and "disfavored," Manning, 725 F.3d at 59 ("[A] court should typically await the development of a factual record before determining whether the case should move forward on a representative basis."). Defendants' motion does not present the exceptional circumstances that justify relief prior to the certification phase.

First, defendants take issue with the class definition, arguing that it is defective in a number of ways. But at present, the class definition set forth in the amended complaint is "a proposal—and not by any means a certainty." Wirt v. Bon-Ton Stores, Inc., 134 F. Supp. 3d 852, 862 (M.D. Pa. 2015). To the extent there are particular defects, they can be addressed on a motion to certify, when the court has the discretion to redefine or limit the class if necessary. See Manning, 725 F.3d at 60 ("[T]he district court has many tools at its disposal to address concerns regarding the appropriate contours of the

putative class, including redefining the class during the certification process or creating subclasses.").  On its face, the class definition is not so wholly implausible or defective as to justify striking the class allegations.  Accord Guy v. Toys R US, No. 16-CV-2224-AJB-JMA, 2017 WL 2230146, at *3 (S.D. Cal. May 22, 2017) (noting potential problems with class definition but declining to address on motion to strike); Wirt, 134 F. Supp. 3d at 861-62 (same).  But see Monteferrante v. Williams-Sonoma, Inc., 241 F. Supp. 3d 264, 271-73 (D. Mass. 2017) (striking class definition that encompassed individuals whose claims would be time-barred).

Second, defendants argue that Begley is an atypical and inadequate class representative, because he is subject to a number of unique defenses.  It is true that "[b]oth typicality and adequacy may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation."  In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008).  But without further development of the factual record and the disputed legal issues that will attend this litigation, the court is unable to assess the degree to which any such defenses will become the focus of the litigation.  See Smith v. Specialized Loan Servicing, LLC, No. 16cv2519-GPC, 2017 WL 4181395, at *2 (S.D. Cal. Sept. 21, 2017)

(concluding that motion to strike on basis of typicality and adequacy requirements was premature).

Third, defendants assert that the proposed class is unascertainable and cannot satisfy the numerosity requirement. Defendants argue that because they do not sell WindsorONE boards directly to consumers, the "identities of the members of [the] alleged class" are unknown and cannot be uncovered through discovery. Doc. no. 24-1 at 13-14. They point out that a district court in the Northern District of California denied class certification for a similar suit against defendants on this basis. See doc. no. 10-3 (copy of order). The court is not persuaded. The California district court reached its conclusion on a motion for class certification, after discovery and with the benefit of a fully developed record. Begley should be entitled to the same opportunity.

Fourth, defendants contend that the proposed class cannot meet the superiority and predominance requirements of Rule 23(b)(3). To decide whether a class action is the superior method for adjudicating the controversy, the court considers the following factors:

> (A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;

<pre>        (C)   the desirability or undesirability of concentrating
              the  litigation  of  the  claims  in  the  particular
              forum; and
        (D)   the likely difficulties in managing a class action.</pre>

Fed. R. Civ. P. 23(b)(3)(A)-(D).  For the predominance inquiry,
the court determines whether "there is reason to think that
individualized questions will overwhelm common ones and render
class certification inappropriate." In re Asacol Antitrust
Litig., No. 15-cv-12730-DJC, 2017 WL 5196381, at *22 (D. Mass.
Nov. 9, 2017) (quotation and internal brackets omitted).  In
doing so, the court must "formulate some prediction as to how
specific issues will play out in order to determine whether
common or individual issues predominate in a given case."  Id.
(quoting Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288,
298 (1st Cir. 2000)).

      The court is not in a position to properly assess and weigh
the considerations bearing on superiority and predominance.
Both involve a more expansive inquiry that would benefit from
full discovery and briefing.  See Murdock-Alexander v. Tempsnow
Emp't, No. 16-cv-5182, 2016 WL 6833961, at *5 (N.D. Ill. Nov.
21, 2016) (noting that, generally, "some level of discovery is
essential" to evaluate the predominance requirement).

      Accordingly, the court denies defendants' motion to strike.
However, the court does so without prejudice to defendants
raising these arguments on a motion for class certification.

## Conclusion

For the foregoing reasons, defendants' motion to dismiss (doc. no. 23) is granted to the extent it seeks dismissal of the implied-warranty claim and request for punitive damages, and is otherwise denied. Defendants' motion to strike (doc. no. 24) is denied without prejudice to raising their arguments on a motion for class certification.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 19, 2018

cc: Counsel of Record